THOMAS A. BATTAGLIA, PLAINTIFF-RESPONDENT AND CROSS-APPELLANT, v. UNION COUNTY WELFARE BOARD, AN ENTITY OF THE STATE OF NEW JERSEY, LEDA PERSELAY, BENEDICT LAGANGA, WILLIAM MERRITT, DEBRA GREENBERG, JACOB W. KROWICKI, JR., JEFFREY W. MACCARELLI, JOANNE RAJOPPI, ANTHONY RUSSO, AND ANTHONY AMALFE, ALL INDIVIDUALLY AND AS MEMBERS OF THE UNION COUNTY WELFARE BOARD, HARRY PAPPAS, INDIVIDUALLY AND AS CHAIRMAN OF AND AGENT FOR THE UNION COUNTY DEMOCRATIC COMMITTEE, AND UNION COUNTY DEMOCRATIC COMMITTEE, AN ENTITY CREATED UNDER THE LAWS OF THE STATE OF NEW JERSEY, DEFENDANTS-APPELLANTS AND CROSS-RESPONDENTS.

Argued September 21, 1981—Decided December 16, 1981.

*Bruce I. Goldstein* argued the cause for appellant Union County Welfare Board (*Saiber, Schlesinger, Satz & Goldstein,* attorneys; *Mr. Goldstein* and *William F. Maderer,* of counsel and on the brief).

*Yale Manoff* argued the cause for appellant Leda Perselay, et al. (*Weinberg and Manoff,* attorneys).

*Richard M. Thuring* argued the cause for appellants Harry Pappas and Union County Democratic Committee (*Spagnoli & Thuring,* attorneys).

*Robert H. Jaffe* argued the cause for respondent (*Jaffe & Schlesinger,* attorneys).

The opinion of the Court was delivered by

SCHREIBER, J.

The principal question presented in this case is whether the plaintiff, an attorney for a county welfare board, who was not continued in employment because of his political beliefs, was deprived of his First Amendment rights.

Plaintiff's verified complaint in lieu of prerogative writs sought to compel the defendant Union County Welfare Board (Board) to retain plaintiff in his position as legal assistant to the Board. Plaintiff also charged Harry Pappas, then Chairman of the Union County Democratic Committee, the individual members of the Union County Welfare Board, and the Union County Democratic Committee with violations of 42 *U.S.C.* §§ 1983, 1985 and 1986. The trial court granted summary judgment for the defendants.

The plaintiff appealed. The Appellate Division, holding that there were factual issues to be resolved, reversed and remanded. We granted defendants' petitions for certification and plaintiff's cross petition. 85 *N.J.* 485 (1981).

Plaintiff's contentions are twofold. He argues first that he is a tenured employee by virtue of *N.J.S.A.* 44:7–9 and may be removed only for just cause after notice and hearing. Second, he asserts that the refusal to continue him as legal assistant was based solely upon his political affiliation and consequently violated his First Amendment rights. The verified complaint and affidavits furnish the factual backdrop.

Plaintiff, an attorney-at-law and member of the New Jersey Bar, was hired by the Board as a legal assistant for one year. The term began on July 5, 1977 and ended on July 4, 1978. Plaintiff learned on June 19, 1978 that he would have some trouble being reappointed because Harry Pappas, the new Democratic County Chairman, had not recommended him. Pappas was offended because plaintiff and his friends, members of the New Democratic Coalition, had opposed Pappas's election as Democratic County Chairman. Plaintiff spoke to several Board members who confirmed that they would not vote for him

because the "Party" did not want it. Plaintiff was not reappointed as legal assistant.

The legal assistant's position was part-time, 70 hours per month, and the annual salary was $10,154. The job was not within the classified civil service and plaintiff conceded before the trial court that he was not entitled to protection under the civil service law. Plaintiff contends for the first time in his cross petition for certification that his position was "classified."

Plaintiff claims that as a legal assistant he was a nonpolicy-making and nonconfidential employee. He stated during the oral arguments before the trial court and this Court that he did not participate in making Board policy, but only applied it. For example, he would evaluate a case to determine if there was fraud and transmit the matter to the prosecutor in accordance with Board policy that fraud cases involving more than $500 be submitted for prosecution. Plaintiff also claimed that he did not have the same confidential attorney-client relationship with the Board that an attorney has with a private client.

The trial court found that the Board has authority to retain counsel for a specific period of time and then within its discretion retain someone else. The plaintiff had not been discharged; he simply had not been rehired. The trial court stated that plaintiff's legal opinions were relied upon by the Board and indicated that he held a policymaking position. The court further found that plaintiff had not been deprived of a constitutionally protected property or liberty interest contrary to the Fourteenth Amendment. Finally, it pointed out that *N.J.S.A.* 44:7–9 did not cloak plaintiff with tenure as legal assistant, particularly in view of the statutory language and the regulations of the Department of Human Services, Division of Public Welfare, which exclude legal counsel for county welfare boards from civil service coverage.

The Appellate Division agreed that plaintiff did not have a valid claim to hold employment indefinitely during good behavior. However, the Appellate Division remanded the matter to

the trial court to determine if plaintiff was discharged solely for political reasons and, if so, whether plaintiff occupied a position for which political affiliation was an appropriate job requirement. The Appellate Division's analysis differed somewhat from the trial court's since the Appellate Division had the benefit of the United States Supreme Court opinion in *Branti v. Finkel*, 445 *U.S.* 507, 100 *S.Ct.* 1287, 63 *L.Ed.2d* 574 (1980), decided after the lower court's opinion.

We first address plaintiff's contention that he was entitled to protection under *N.J.S.A.* 44:7-9, a statute governing county welfare boards.

## I

*N.J.S.A.* 44:7-9 provides generally for the organization of the county welfare boards. It states:

> All employees of the county welfare board shall hold their office or employment during good behavior, and may be removed upon written charges and after a hearing, due notice of which shall be given therefor by the county welfare board, for misconduct, neglect, incompetency, or other just cause.

The provision then continues:

> All paid officers and employees of any county welfare board, *except any attorney serving as legal counsel,* which county welfare board operates under the provisions of Title 11, Civil Service, shall be and the same hereby are classified in the competitive class of the classified service. . . . [emphasis supplied]

Plaintiff claims that irrespective of the civil service statute (Title 11), once he became an employee of the county welfare board he was entitled to hold that office during good behavior and therefore he had tenure.

This contention is misplaced. The above statute contemplates two distinct methods under which a county welfare board may operate. If the county has not elected to make the welfare board's employees subject to civil service, then they would be protected under the general provision in *N.J.S.A.* 44:7-9 quoted in the first paragraph above. If an election has been made, then Title 11, Civil Service, governs. When that occurs, however, the second paragraph of *N.J.S.A.* 44:7-9 quoted

above excludes attorneys serving as legal counsel from the classified service and consequently from the protection afforded by that classification.

■ Since Union County had elected to place its employees under the aegis of civil service, plaintiff as legal assistant fell within the unclassified category. Plaintiff admitted at the trial that his status has always been unclassified. His signed request for personnel action submitted to the Department of Civil Service upon his appointment reflected that his position was unclassified. The uncontradicted affidavit of the county personnel director asserted that plaintiff's position had always been in the unclassified service. Indeed, the statutory language explicitly excludes from the classified service attorneys serving as legal counsel to county welfare boards.[1]

## II

■ Under the Fourteenth Amendment a public employee may not be deprived by the State of "property" or "liberty" without due process of law. *Board of Regents v. Roth*, 408 *U.S.* 564, 92 *S.Ct.* 2701, 33 *L.Ed.2d* 548 (1972); *Bishop v. Wood*, 426 *U.S.* 341, 96 *S.Ct.* 2074, 48 *L.Ed.2d* 684 (1976). The Supreme Court has held that a public employee who has no statutory or contractual entitlement to his job has no property interest. Thus, an employee hired at will or one whose term of office has expired has no entitlement to the position and may not prevail on a claim that loss of the employment constituted deprivation of property. *See Board of Regents v. Roth*, 408 *U.S.* at 578, 92 *S.Ct.* at 2709, 33 *L.Ed.2d* at 561 (holding that no property interest existed in employment at expiration of college teacher's one-year term).

---

[1] In his cross petition for certification, plaintiff claims for the first time that he is entitled to civil service protection because of certain provisions in Title 11. Since the issue was not raised below, we see no need to pass upon the matter. *Cox v. Valley Fair Corp.*, 83 *N.J.* 381, 387 (1980).

■ Plaintiff has not asserted a property interest. Since, as discussed above, he had no statutory or contractual right to the legal assistant's position, plaintiff did not lose a property right when his term of office had been completed. However, plaintiff, relying upon *Nicoletta v. North Jersey District Water Supply Commission*, 77 *N.J.* 145 (1978), claims that the State has deprived him, contrary to the Fourteenth Amendment, of his "liberty" interests without due process of law. Plaintiff's position is not sound.

■ In *Nicoletta*, we held that an at-will public employee, not in the classified civil service, was entitled to a due process hearing because, under then existent civil service regulations, removal exposed him to potential disqualification from further public employment. Under those circumstances we held that impairment of future employability by operation of state law constituted deprivation of a "liberty" interest entitled to protection under the Fourteenth Amendment. Such protection ordinarily consists of a hearing "to clear any damage to [the employee's] reputation." *Williams v. Civil Service Commission*, 66 *N.J.* 152, 157 (1974); *accord, Codd v. Velger*, 429 *U.S.* 624, 97 *S.Ct.* 882, 51 *L.Ed.*2d 92 (1977).

■ Plaintiff does not face disqualification from future public employment because the civil service regulation which allowed the plaintiff to prevail in *Nicoletta* has been amended. The regulation now provides that potential disqualification may occur only when the public employee "[h]as been dismissed from the public service for delinquency or misconduct after an opportunity for a hearing." *N.J.A.C.* 4:1–8.14(b)(6). Plaintiff's dismissal was not attributable to delinquency or misconduct so the civil service regulation does not disqualify him from public service in the future.

Plaintiff has not charged that the termination of employment reflected adversely on his reputation. There has been no public disclosure by the public employer that could be said to have impaired plaintiff's reputation, honor or integrity. Hence, no

basis for injury to his "liberty" interest in this respect is apparent or is advanced. *Bishop v. Wood*, 426 *U.S.* 341, 96 *S.Ct.* 2074, 48 *L.Ed.*2d 684 (1976).

## III

We come next to the heart of plaintiff's case. He claims that his First Amendment right to express his political beliefs precludes nonrenewal of his contract. Such a right may be asserted despite the lack of a contractual or tenure right to reemployment. *Perry v. Sindermann*, 408 *U.S.* 593, 92 *S.Ct.* 2694, 33 *L.Ed.*2d 570 (1972). First Amendment rights are incorporated in the Fourteenth Amendment and therefore limit state action. *See Edelman v. Jordan*, 415 *U.S.* 651, 667 n.12, 94 *S.Ct.* 1347, 1358, 39 *L.Ed.*2d 662, 675 (1974) ("county action is generally state action for purposes of the Fourteenth Amendment"). Though the Fourteenth Amendment bears directly on the State, analytically it is the more specific provisions of the First Amendment that finally govern. *West Virginia Board of Education v. Barnette*, 319 *U.S.* 624, 639, 63 *S.Ct.* 1178, 1186, 87 *L.Ed.* 1628, 1638 (1943).

Two Supreme Court opinions serve as our yardsticks, *Elrod v. Burns*, 427 *U.S.* 347, 96 *S.Ct.* 2673, 49 *L.Ed.*2d 547 (1976), and *Branti v. Finkel*, 445 *U.S.* 507, 100 *S.Ct.* 1287, 63 *L.Ed.*2d 574 (1980). In *Elrod*, a newly elected Democratic sheriff discharged nontenured Republican employees—a process server, an office employee, a bailiff and an office supervisor—and replaced them in accord with past patronage practice. Justice Brennan, writing for a plurality of three members of the Court,[2] held that discharges ascribable to political patronage infringed upon the employees' First Amendment rights of political belief and association. To be valid such discharges would have to serve a compelling state interest that could not be served in a less

---

[2]Justice Stevens did not participate and the decision was made by an eight-person Court.

drastic manner. Justice Brennan found that this test was not met with respect to the employees concerned. He agreed that "[l]imiting patronage dismissals to policy making positions" would be sufficient to achieve proper governmental purposes. In this manner "representative government [would] not be undercut by tactics obstructing the implementation of policies of the new administration, policies presumably sanctioned by the electorate." 427 *U.S.* at 367, 96 *S.Ct.* at 2687, 49 *L.Ed.*2d at 562. When that governmental purpose is not served, conditioning continued employment on support of a political party is constitutionally impermissible.

Justice Stewart, joined by Justice Blackmun, concurred. The concurrence, and consequently the holding of *Elrod*,[3] expressed the view that a "nonpolicymaking, nonconfidential government employee [cannot] be discharged or threatened with discharge from a job that he is satisfactorily performing upon the sole ground of his political beliefs." 427 *U.S.* at 375, 96 *S.Ct.* at 2690, 49 *L.Ed.*2d at 566.

Justice Powell, the Chief Justice and Justice Rehnquist dissented. Their rationale centered on the historical and governmental justification of the political patronage system, although they also questioned the right of employees to dispute the validity of a system of which they had been the beneficiaries.

In *Branti v. Finkel*, a challenge was raised when a newly appointed Public Defender of a different political party from that of his predecessor attempted to discharge assistant public defenders because of their political beliefs. The assistants served at the pleasure of the Public Defender. The Supreme Court upheld a permanent injunction enjoining such terminations. Justice Stevens, writing for a six-person majority, held that "if an employee's private political beliefs would interfere

---

[3]*See* Marks v. United States, *430* U.S. *188, 193, 97* S.Ct. *990, 993, 51* L.Ed.2d *260, 266 (1977) (the holding of a divided majority may be viewed as that position taken by the justices who concurred in the judgment on the narrowest grounds).*

with the discharge of his public duties, his First Amendment rights may be required to yield to the State's vital interest in maintaining governmental effectiveness and efficiency." 445 *U.S.* at 517, 100 *S.Ct.* at 1294, 63 *L.Ed.*2d at 583. The criteria were not necessarily whether the job was confidential or policy-making in character. The true question was "whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." 445 *U.S.* at 518, 100 *S.Ct.* at 1295, 63 *L.Ed.*2d at 584.

Justice Stewart dissented. He believed that the assistants as lawyers in the Public Defender's office had a relationship of confidence and trust with the Public Defender. He analogized the situation to that of a firm of lawyers. Justice Powell, joined in dissent by Justice Rehnquist, contended as he had in *Elrod* that the patronage system served an appropriate governmental function. He also could not envision any reason for differentiating between selection by the electorate of the Public Defender and assistant public defenders and delegation of authority to make that selection to duly elected representatives.

 We are bound by the Supreme Court's interpretation and application of the First Amendment and its impact upon the states under the Fourteenth Amendment. As we previously observed, the holding of *Elrod* was that a nonpolicymaking, nonconfidential public employee could not lawfully be discharged solely because of his political beliefs. *Branti* refined that principle. It posed the problem in terms of job qualification. Was party affiliation an appropriate requirement for the effective performance of the position?

The Court's reasoning indicated that policymaking and confidentiality may or may not be helpful criteria in deciding whether party affiliation is an appropriate employment condition. The Court set forth several examples. A state election law requiring that precincts be supervised by two election judges of different parties could properly lead to the discharge of a judge

who had changed his party registration. Yet the position does not involve policy decisions or access to confidential information. On the other hand, the effective performance of a policymaking position would not necessarily require a certain party affiliation. For example, a football coach's policymaking activities at the state university do not depend on whether he is a Republican or Democrat. However, *Branti* explained that it was self-evident that a governor's speech writer, press secretary and legislative liaison should share his political beliefs and party commitments to effectively carry out their duties. In each of these situations it is likely that confidentiality and policymaking would be constituent elements of the job. Thus, *Branti* did not eliminate the policymaking and confidentiality factors espoused in *Elrod*. Those criteria may not be conclusive but could properly be elements in deciding whether party affiliation would probably cause an official to be ineffective in performing the duties of his office.

*Branti* extended First Amendment protection to the assistant public defender for two reasons. First, his principal responsibility was to represent a defendant in a criminal proceeding and his confidential attorney-client relationship was with that person. Second, whatever policymaking occurred in the Public Defender's office insofar as the assistant public defender was concerned had to relate to the needs of the individual defendants and not to any partisan political interests. The Court rejected party affiliation as a requisite of being an assistant public defender because of the nonconfidentiality and nonpolicymaking characteristics of the job, and because political considerations would undermine, rather than promote, effective performance by a public defender.

Justice Stevens in *Branti* contrasted the position of an assistant public defender with that of a prosecutor, indicating that party affiliation is an appropriate qualification for that office because of its "broader public responsibilities." 445 *U.S.* at 518 n. 13, 100 *S.Ct.* at 1295, 63 *L.Ed.*2d at 584. Though

Justice Stevens wrote that the Court was expressing no opinion with respect to a prosecutor's deputy,[4] it follows that, if a prosecutor's deputy had the same duties as the prosecutor, his party affiliation would likewise be a proper qualification. Thus, *Branti* stands for the proposition that nontenured government attorneys, whose broad public responsibilities are confidential in nature and involve formulating or implementing policy relating to political beliefs, may be discharged when the effective performance of their duties is compromised because of a difference in political commitment. Conversely, a public employee whose employment does not depend upon such a relationship and whose effective performance is not related to party affiliation may not be discharged because of his political beliefs.

An issue raised in this case is whether the *Branti* principle applies only when a discharge occurs. The defendants contend that plaintiff Battaglia was not discharged, but that his term had expired and he was simply not rehired. Though Justice Stevens posed the question in *Branti* in terms of "discharge," he framed the ultimate inquiry in terms of the "hiring" authority. 445 *U.S.* at 508, 518, 100 *S.Ct.* at 1289, 1294, 63 *L.Ed.* 2d at 577, 584. The Supreme Court has not addressed the problem as it might involve filling a newly created position. Nor is it necessary that we do so.[5] In *Branti* the assistant public defenders served at the pleasure of the Public Defender and their terms were said to expire automatically when the Public Defender's term ended. The Supreme Court rejected the contention that a failure to reappoint was not a dismissal. 445 *U.S.* at 512 n. 6, 100 *S.Ct.* at 1291, 63 *L.Ed.*2d at 580. Since no

---

[4]The Court referred to *Newcomb v. Brennan*, 558 *F.*2d 825 (7th Cir. 1977), *cert.* den., 434 *U.S.* 968, 98 *S.Ct.* 513, 54 *L.Ed.*2d 455 (1977), wherein dismissal for political reasons of a deputy city attorney who under the municipal code had all the duties imposed by law on the city attorney was upheld.

[5]See discussion in "The Supreme Court, 1975 Term, Patronage Firings," 90 *Harv.L.Rev.* 186, 195–96 (1976), arguing that patronage hirings be treated the same as patronage dismissals.

functional difference exists between the failure to reappoint at the end of a fixed term and the dismissal of an at-will employee, the *Branti* rule would appear to be equally applicable to both. *See Brady v. Paterson*, 515 *F.Supp.* 695 (N.D.N.Y. 1981); Note, "Patronage and the First Amendment after *Elrod v. Burns*," 78 *Colum.L.Rev.* 468, 474–75 (1978) ("Thus, in the case of non-rehiring, the outcome of the balancing of the burden on first amendment rights against the furtherance of vital state interests is almost identical to the result arrived at in the case of patronage dismissals.").

## IV

We turn next to apply the proposition extrapolated from *Elrod* and *Branti* to determine whether political affiliation is an appropriate qualification for a public employee serving as an attorney for a county welfare board. The answer depends on the responsibilities of the office. Plaintiff contends that he was not in fact called upon during his year of service to perform any function involving policymaking, and that no confidences were communicated to him in his attorney-client relationship with the Board. The flaw in this contention is the failure to consider that the legal assistant was obligated, if called upon, to perform the duties delineated in the job's specifications.

The Division of Public Welfare of the Department of Human Services (Division), pursuant to *N.J.S.A.* 44:7–6, promulgated regulation *N.J.A.C.* 10:109–2.2, relating to the personnel of county welfare boards. That regulation prescribes in part that the duties of counsel and legal assistant

include all of the following, and may include such additional duties as the county welfare board may prescribe:

i. Renders legal opinions and gives legal guidance on all matters affecting welfare board administration;

ii. Prepares all legal documents and represents the welfare board in court proceedings necessary for welfare board administration of the several public assistance programs for which the county welfare board is responsible under statute and regulations promulgated by the State Division of Public Welfare;

iii. Acts as proctor to and/or administrator of estates of deceased clients, where appropriate and necessary;

iv. Assumes responsibility for carrying through all guardianship proceedings on behalf of incompetent clients.

The plaintiff, as one of four legal assistants, could be called upon at any time to perform the same duties as the Board's counsel. As legal assistant he could be requested to render legal opinions and give legal guidance on all matters affecting the Board's administration. He could be called upon to prepare all legal documents, as well as to represent the Board in court proceedings necessary for administration of public assistance programs. The correct perspective is not only what the plaintiff as legal assistant did, but also what the duties of the position were.

As distinguished from the assistant public defender in *Branti*, plaintiff represented the Board. His attorney-client relationship could include the Board's confidential communications. Those confidences could properly concern policymaking or other matters that were an integral part of its political philosophy.[6] The Board had the right to repose its trust and confidence in its counsel and legal assistants. Trust and confidence are the essence of the attorney-client relationship. Assuredly, a public body should not be compelled, at least in the absence of some legislative directive, to retain an attorney when those elements do not exist. In *Perrella v. Board of Education of Jersey City*, 51 *N.J.* 323 (1968), we referred to

the peculiar relationship which a member of the bar has as counsel to a public body. It is a position of trust and confidence. It is born in the confidence the public body, rarely of permanent status, has in the ability, honesty and personality of the individual selected. In common sense the relationship is simply that of attorney and client, basic to which, from time immemorial, has been the desirability of personal selection of the attorney by the client. [*Id.* at 331]

Since the attorney-client relationship is a confidential one, it is appropriate for the attorney to have a political philosophy compatible with that of the client. Particularly when the sub-

---

[6]All parties have assumed that the County Welfare Board's decisionmaking in some areas, such as determining what fraud cases should be prosecuted, implicate policy choices about which political groups may differ.

ject matter of the confidence may relate to that philosophy, the loyalty and trust inherent in the relationship are practical necessities. Responsibilities of the Board's legal counsel are broad in scope and include acting as a high level adviser and participant in formulating the County Welfare Board's plans for implementation of its policy goals. Plaintiff has also described legal counsel's position as one involving "the implementation of policy and discretionary decision making" and at least implicitly agreed that legal counsel could legitimately be required to be of the same political persuasion as the Board. Plaintiff's obligations as legal assistant were as far-reaching as those of the legal counsel and embraced any and all matters that might come before the Board. There is therefore no reason why the legal assistant should not be subject to the same job requirements as the legal counsel, meaning that party affiliation would be an appropriate qualification for the assistant as well.[7]

In *Ness v. Marshall*, 660 *F.*2d 517 (3d Cir. 1981), Judge Gibbons of the Third Circuit was recently presented with a similar situation. Plaintiffs, a city solicitor, an assistant solicitor and a second assistant solicitor, were discharged by a newly elected mayor, a Democrat who replaced a Republican. The dismissed attorneys filed suits asserting a violation of their rights under the First Amendment and the Civil Rights Act of 1871, 42 *U.S.C.* § 1983. The Circuit Court of Appeals affirmed summary judgments in favor of the defendants. It rejected the argument that the assistant and second assistant solicitor acted only on matters unrelated to political goals or commitments and were therefore not subject to removal. Rather, the Court referred to the duties imposed on the city solicitor and his assistants by the city's administrative code. These included rendering legal opin-

---

[7]None of the parties has sought to differentiate intraparty from interparty differences. We have accepted this assumption. See *Mirabella v. Board of Elections*, 507 *F.Supp.* 338 (S.D.N.Y.1980), and *Catterson v. Caso*, 472 *F.Supp.* 833 (E.D.N.Y.1979). To the extent that the Supreme Court has not addressed this question, it may be considered an open one.

ions to the mayor, drafting ordinances and negotiating contracts. A position with these duties was one "for which party affiliation [was] an appropriate requirement." Moreover, the fact that one mayor may have chosen to utilize solicitors in a more restricted manner should and would not stand as a bar to others who may rely on the attorneys to the extent allowed by the code. We find Judge Gibbons's reasoning persuasive. See also *Alfaro DeQuevedo v. DeJesus Schuck*, 556 *F.2d* 591 (1st Cir. 1977) (relying in part on the job specifications of attorney in charge of criminal justice and not on what the employee did in fact, court held dismissal under new administration was proper); *Catterson v. Caso*, 472 *F.Supp.* 833 (E.D.N.Y.1979) (analyzing duties of county attorney in terms of administrative code and holding dismissal arising out of intraparty strife proper). *But see Layden v. Costello*, 517 *F.Supp.* 860 (N.D.N.Y.1981) (where attorney's job did not require him to perform any duties for the public employer though specifications did, discharge for political reasons held invalid).[8]

---

[8]A careful reading of the dissent discloses its agreement with the following: (1) An attorney-client relationship existed between the legal assistant and the County Welfare Board; (2) A legal assistant's prescribed duties were the same as the legal counsel and included offering advice to the Board on policy matters; (3) The County Welfare Board could exercise its discretion on some policymaking matters.

The dissent argues that there were no "political differences" between the Welfare Board and the plaintiff, rather the differences existed between the Democratic County Chairman and the plaintiff. The undisputed fact is that the Welfare Board decided not to rehire him. Since the Welfare Board has admitted that it did not rehire plaintiff for political reasons, what motivated the Welfare Board is *only* relevant. It is *only* because the Welfare Board acted for a political reason that plaintiff has a First Amendment claim. If the Welfare Board had acted on a nonpolitical basis, he clearly would have had no ground for a constitutional challenge. Thus, the dissent's reasoning is flawed, for it argues that plaintiff was not rehired because of the County Chairman's political thinking which it assumes was *not* attributable to the Welfare Board. If that were so, and the Welfare Board had not acted for a political reason, plaintiff would have had no First Amendment claim. See *English v. College of Medicine and Dentistry of N. J.*, 73 *N.J.* 20 (1977) (holding that a public employee not in a civil service classification could be

The Appellate Division remanded the cause to the trial court to resolve two factual issues: Was plaintiff discharged solely for political reasons? If so, did he occupy a policymaking, confidential position such that party affiliation is an appropriate requirement for effective performance of the job? Even if the discharge were ascribable to political causes, the uncontradicted proofs, as in *Ness v. Marshall, supra,* establish as a matter of law that the policymaking and confidential nature of the position potentially involved policymaking responsibilities and that the confidentiality of the position related directly to the public employer, the Union County Welfare Board. Thus, the legal assistant's duties were such that party affiliation was an appropriate requirement for the effective performance of the office.

Judgment of the Appellate Division is reversed and the trial court's judgment of dismissal is reinstated.

POLLOCK, J., dissenting.

The issue on this appeal is whether a county welfare board has met its burden of proving that allegiance to the county chairman of a political party is an appropriate requirement for the effective performance of the office of legal assistant to the board. As a matter of law, the majority concludes that alle-

lawfully discharged with or without cause in the absence of a contractual, statutory or constitutional protection).

Realistically, the dissent constitutes a plea against any political patronage. It is an argument more properly addressed to the Supreme Court. Our task is to apply the principles enunciated by that body. We refuse to broaden and extend the *Branti v. Finkel* doctrine, which incidentally has been subject to substantial criticism. *Loughney v. Hickey,* 635 *F.*2d 1063, 1065 (3d Cir. 1980) (Aldisert, J., concurring); *Garretto v. Cooperman,* 510 *F.Supp.* 816 (S.D.N.Y.1981); Auerbach, "The Relation of Legal Systems to Social Change," 1980 *Wis.L.Rev.* 1227, 1336 (suggesting that the Supreme Court may be hastening the decline of broad-based political parties which make executive leadership and coherent legislative policy possible). Indeed, it is anomalous that plaintiff who presumably obtained his job because of political patronage and sought to be rehired because of political influence now asserts that methodology is improper.

giance to the county chairman, who was not a member of the board, is an appropriate requirement for the office. I dissent.

Because we are reviewing the grant of a motion for summary judgment, we must assume as true all facts set forth in opposition to the motion and accord the opposing party the benefit of all inferences that reasonably may be drawn from these facts. Thus viewed, the relevant facts are that in June, 1977 Battaglia was appointed to a one-year term as a legal assistant to the Union County Welfare Board. In May, 1978, a majority of the members of the Board assured him that he "would have no difficulty being reappointed." The membership of the Board did not change at any material time. In June, 1978, notwithstanding the opposition of Battaglia, his wife and others, Harry Pappas was elected Democratic county chairman. Pappas refused to submit Battaglia's name to the Board for reappointment. Thereafter, Battaglia called several members of the Board who told him that they could not vote for him because Pappas had told them he should not be reappointed. One member explained his refusal by stating as "a matter of party discipline, he had to vote the way the County Chairman [Mr. Pappas] told him." Pappas' instructions were the only reason the Board failed to reappoint Battaglia. Battaglia's dispute was not with the Board, but with Pappas. No one questioned his competence as a legal assistant or manifested any lack of confidence in him.

Neither Pappas nor any member of the Board submitted any affidavit contradicting Battaglia's statement of the facts. The majority finds the uncontradicted facts to be unpersuasive because of the written description of the position of legal assistant.

As with other attorney-client relationships, confidence by members of a public body in their counsel is essential. *See* *Shakman v. Democratic Organization of Cook Cty.*, 508 *F.Supp.* 1063, 1069 n.12 (N.D.Ill.1981). Because a difference in party affiliation may affect the confidence of a public body in its counsel, political patronage may have a role in the selection of attorneys for public bodies. In this case, however, there is not a

single fact justifying the conclusion that the Board lacked confidence in Battaglia. On the record before us, the opposite is true. The Board believed Battaglia to be competent and, if left alone, it would have continued his employment. The sole reason the Board failed to continue Battaglia's employment was that as a matter of party discipline, the county chairman wanted to punish Battaglia. Consequently, this case differs from cases where, because of political differences, a mayor or governing body does not want to employ an attorney.

Two decisions of the United States Supreme Court establish the degree to which freedom of speech and thought are guaranteed to government employees whose jobs are imperiled by political patronage. In both decisions, the Court placed a higher value on freedom of political thought than on political patronage. In *Elrod v. Burns*, 427 *U.S.* 347, 96 *S.Ct.* 2673, 49 *L.Ed.2d* 547 (1976), the majority opinion limited patronage dismissals to policymaking and confidential positions. In *Branti v. Finkel*, 445 *U.S.* 507, 518, 100 *S.Ct.* 1287, 1294, 63 *L.Ed.2d* 574 (1980), the Court expanded protection of government employees by stating that the emphasis should not be whether the employee was in a policymaking position, but "whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved."

The line delineating policymaking positions is hazy, as is the determination whether party affiliation is an appropriate requirement for the effective performance of a public office. *See Barrett v. Thomas*, 649 *F.2d* 1193 (5 Cir. 1981) (political demotion of sheriff sergeant impermissible); *Garretto v. Cooperman*, 510 *F.Supp.* 816 (S.D.N.Y.1981) (political dismissal of compensation judge permissible) (*Branti* test is *dicta*); *McMullan v. Thornburgh*, 508 *F.Supp.* 1044 (E.D.Pa.1981) (political dismissal of dept. of health registrars impermissible); *Shakman v. Democratic Org. of Cook County*, 508 *F.Supp.* 1063 (N.D.Ill.1981) (simply showing employee occupies a highly confidential position of significant policymaking not enough to justify political dismissal) (*dicta*); *McMahon v. Board of Selectmen of Town of*

*Newtown*, 506 *F.Supp.* 537 (D.Conn.1981) (political dismissal of grants administrator and assistant to first selectman impermissible). Courts have had particular difficulty with the *Elrod* and *Branti* tests in cases involving attorneys for public bodies. *Compare Ness v. Marshall*, 660 *F.*2d 517 (3 Cir. 1981) (political dismissal of city solicitor proper) and *Bavoso v. Harding*, 507 *F.Supp.* 313 (S.D.N.Y.1980) (political dismissal of corporation counsel proper) *with Layden v. Costello*, 517 *F.Supp.* 860 (N.D.N.Y.1981) (political dismissal of counsel to Department of Social Services improper).

In assaying the validity of political retaliation as a cause for the termination of public employment, courts have considered various elements, including the structure and duties of the public body employing the dismissed employee, *Bavoso v. Harding, supra*, 507 *F.Supp.* at 316; and the nature and duties of the employee's position, *see e.g., Ness v. Marshall, supra; Garretto v. Cooperman*, 510 *F.Supp.* 816, 818 (S.D.N.Y.1981). Another consideration is whether the political allegiance of the dismissed employee or of the controlling members of the public body has shifted from one party or one faction within a party to another. We next discuss the application of those considerations to this case.

Like many public bodies, welfare boards have some policymaking authority. Unlike the broad discretionary powers of municipalities, *N.J.S.A.* 40:48–1 and –2, and of county boards of chosen freeholders, *N.J.S.A.* 40:20–1, however, a welfare board has limited discretion. For the most part, welfare boards serve to administer programs funded by federal, state and county government. Accordingly, a board's discretion is severely restricted by state and federal regulation.[1]

---

[1] *See* N.J.A.C. *10:81–1.2 (Aid to Families With Dependent Children) (AFDC);* N.J.A.C. *10:83–2.5 (Medical Assistance to the Aged) (MAA);* N.J.A.C. *10:87–1 (Food Stamps)* and N.J.A.C. *10:89 (foreword) (Energy Assistance). The Department of Human Services' regulations are extensive, covering every phase of the programs from eligibility,* N.J.A.C. *10:81–3.1 to –3.39 (AFDC);*

Aside from its duties, the structure of the board indicates a legislative intention to insulate the board's activities from county politics. Although board members are appointed by the board of chosen freeholders, *N.J.S.A.* 44:1–11 (Supp.1981), their appointments are for five-year terms that expire seriatim. *N.J. S.A.* 44:1–12. Because the board contains from five to seven citizen members, *N.J.S.A.* 44:1–11 (Supp.1981), it would take at least three years for a new political group to control the board. The apparent intent is to prevent a freeholder board from gaining control of a welfare board in any single year. In addition each board must appoint a director of welfare to serve as its chief executive. *N.J.S.A.* 44:7–11 (Supp.1981). As chief executive, the director may influence and must implement decisions of the board. Removal, as well as appointment of the director is controlled by civil service laws, not political patronage, and the political allegiance of the director will not subject him to a patronage dismissal. Nonetheless, the majority concludes that the political allegiance of an assistant counsel so imbues the performance of his duty that he is subject to a patronage dismissal. In the absence of factual support, I do not share that conclusion, particularly here where the county chairman was not a member of the Welfare Board or of the Board of Freeholders. In any event, the Board never stated that Battag-

---

N.J.A.C. *10:83–5.1 to –6.21 (MAA);* N.J.A.C. *10:87–3.2 to –5.10 (Food Stamps);* N.J.A.C. *10:89–2.1 to –2.3 (Energy Assistance), to recovering fraudulently received payments,* N.J.A.C. *10:81–7.4D to .42 (AFDC) (board's role limited to determining whether there is a basis for believing fraud occurred; matter is then referred to prosecutor to determine what further action shall be taken);* N.J.A.C. *10:87–11.2 to –11.9 (Food Stamps) (board's counsel to help decide which cases to refer but establishing state policy that board should initiate court action in cases involving more than one act of fraud or large amounts of money). Federal statutes and regulations are also extensive.* See, e.g., *7 U.S.C.A. § 2011 et seq. (Supp.1981); 7 C.F.R. §§ 271.1 to 279.10 (1981) (Food Stamps); 42 U.S.C.A. § 601 et seq. (1974 and Supp.1981), 45 C.F.R. §§ 224.0 to 235.40 (1980) (AFDC); 42 U.S.C.A. § 1396 et seq. (1974 & Supp. 1981); 42 C.F.R. §§ 430.0 to 456.657 (1980) (Medicaid); 42 U.S.C.A. § 8612 et seq. (Supp.1981); 45 C.F.R. §§ 260.1 to 260.314 (1980) (Energy Assistance).*

lia's political beliefs affected, or even might affect, the effective performance of his duties.

The majority hypothesizes from the job description of a legal assistant sufficient policymaking duties to justify a political dismissal. One can search that description in vain for any reference to the word "policy." Indeed, at oral argument the attorney for the Board conceded that Battaglia was not a policymaker. Nonetheless, the majority speculates that Battaglia or someone else in the position of legal assistant might be asked to serve as a policymaker. Although it is conceivable that Battaglia, as the majority speculates, might have been asked to offer counsel on policymaking, it remains that Battaglia was not a policymaker and would not have become one if his employment had been continued. As a matter of law, without according him a hearing to test those speculations, the majority deprives Battaglia of his employment. I respectfully submit that decision contravenes *Elrod* and *Branti, supra.*

The majority decision deprives Battaglia of his employment without a plenary hearing on critical factual questions such as (1) whether the Board retained its confidence in him after Pappas became county chairman but refused to appoint him in blind allegiance to Pappas; (2) whether allegiance to the chairman of a political party is an appropriate requirement for the performance of the duties of legal assistant to the Board where the chairman is not a member of the board; (3) whether any Board members were allied with Pappas in his candidacy for county chairman and whether his election signalled any change in Board policy; and (4) whether the position of legal assistant to the Board is a confidential or policymaking position. Where members of a county welfare board and one of its legal assistants are members of the same political party, and the board wants to continue the employment of the assistant, the employment should not be terminated solely because of a political difference between the attorney and the party chairman who is not a member of the board.

Freedom of political belief has been placed high in the constitutional firmament by the United States Supreme Court. Without adequate factual justification, this Court should not tarnish that freedom to accommodate political punishment.

After the trial court granted defendants' motion for summary judgment and while the appeal was pending in the Appellate Division, the United States Supreme Court decided *Branti*. Relying on that decision, the Appellate Division reversed the summary judgment and remanded the matter for a plenary hearing. *Accord, DeLong v. United States*, 621 *F*.2d 618 (4 Cir. 1980) (although court agreed with trial court decision based on *Elrod*, case remanded for reconsideration in light of *Branti*). In the present case, the majority decision improperly relieves the Board of its burden to justify Battaglia's political dismissal. The effect of that decision is to preclude both the public and Battaglia from learning the facts underlying the termination of his employment. Where a government employee, albeit an attorney, has lost his job because he exercised his freedom of political belief, a legalistic construction of a job description is no substitute for full disclosure of the relevant facts. A remand for a plenary hearing is neither an indictment of political patronage nor an extension of *Branti*. I would affirm the judgment of the Appellate Division and remand the matter to the trial court.

Justice CLIFFORD joins in this dissent.

*For reversal*—Chief Justice WILENTZ, Justices PASHMAN, SCHREIBER, HANDLER and O'HERN—5.

*For affirmance*—Justices CLIFFORD and POLLOCK—2.