**Arnaldo JIMENEZ–FUENTES, et al., Plaintiffs, Appellees,**

v.

**Hon. Jaime TORRES GAZTAMBIDE, et al., Defendants, Appellants.**

No. 85–1655.

United States Court of Appeals, First Circuit.

Argued Sept. 13, 1985.

Decided Dec. 20, 1985.

Opinion on Denial of Rehearing Feb. 6, 1986.

Torruella, Circuit Judge, filed concurring opinion.

Opinion on rehearing en banc, 807 F.2d 236.

Marcos A. Ramirez Lavandero, Hato Rey, P.R., for defendants, appellants.

Frank Rodriguez-Garcia, Ponce, P.R., for plaintiffs, appellees.

Before CAMPBELL, Chief Judge, ALDRICH and TORRUELLA, Circuit Judges.

BAILEY ALDRICH, Senior Circuit Judge.

Sir Winston Churchill once said, "Politics are almost as exciting as war, and quite as dangerous." Remarks, 1920. While the dangers of war are difficult to contain, the courts, federal and state, have made determined efforts in the lesser field. *E.g., Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *Colon v. CRUV,* 84 J.T.S. 52 (P.R.1984); *Montaquila v. St. Cyr,* 433 A.2d 206 (R.I.1981); *Battaglia v. Union County Welfare Bd.,* 88 N.J. 48, 438 A.2d 530 (1981). At the same time, if we may advance our own phrase, politics is the life-blood of the body politic, and too much constraint could be as dangerous as too little. In the present case, defendant appellants claim over-restraint.

In an attempt to set rules for patronage, or what has been grossly called the spoils system, the legislature of the Commonwealth of Puerto Rico enacted the Puerto Rico Public Service Personnel Act of 1975, P.R.Laws Ann., tit. 3, §§ 1301–1431, hereafter, Personnel Law. Under this law, civil service positions in Puerto Rico are drawn into two categories: career employees and confidential employees. *Id.* § 1349. Career employees are selected and promoted solely on the basis of merit; confidential employees "shall be of free selection and removal." *Id.* § 1350. The position of regional director in the Urban Renewal and Housing Corporation, or CRUV (Corporacion de Renovacion Urbana y Vivienda), is designated a confidential position.

In November, 1984, after eight years of governors of the Partido Nuevo Progresista (PNP), the Partido Popular Democratico (PDP) won the governorship, the actual change taking place on January 2, 1985. After a discharge on January 4, shortly revoked, on March 20 plaintiff Jose Vicente Vazquez, a PNP member, was demoted from his position of Regional Director of the San Juan I District to a career position in the agency. On March 18, plaintiff Arnaldo Jimenez Fuentes, Regional Director for Caguas, had been similarly demoted. These actions were the result of orders by defendant Jaime Torres Gaztambide, the newly appointed PDP Secretary of the Department of Housing. The present suit by Jimenez and Vazquez names Gaztambide and Rolando Quevedo del Rio, Executive Director of CRUV, as defendants, alleging the demotions violated plaintiffs' First Amendment rights, and seeking restoration to their previous positions. After a twelve day hearing the district court issued a preliminary injunction ordering that relief. We denied a stay and granted an expedited appeal, and now affirm.

The basis of the constitutional claim is that plaintiffs are members of the PNP and defendants of the PDP, and, allegedly, defendants removed plaintiffs for that political reason. Defendants deny this, but assert it would be a protected reason in any event, and say, further, that there were substantive reasons beyond that. The court found against them on all points.

By this time we need not dwell on the principle that the district court's findings of fact must stand unless clearly wrong, or based upon an error of law. This includes the court's present necessary

findings of a likelihood that plaintiffs will succeed on the merits, that they would, meanwhile, suffer irreparable harm, superior to that suffered by defendants, and that an injunction would be in the public interest. *Planned Parenthood League of Mass. v. Bellotti*, 641 F.2d 1006, 1009 (1st Cir.1981). On this basis we need spend no time on defendants' attempt to criticize the court's finding that the demotions were politically motivated. There were eleven regional directors, all PNPs, and, in one way or another, defendants got rid of all eleven, without apparent reference to personal performance. Defendants' asserted ignorance of party affiliation is incredible on its face.

■ As to their second point, defendants' reliance on the classifications in the Personnel Law is misplaced. However material that statute may be in determining whether an employee has a property right in his job from the standpoint of due process removal and actions for discrimination, *cf. Bishop v. Wood*, 426 U.S. 341, 345, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976); *Perry v. Sindermann*, 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972); *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972), the First Amendment right recognized in *Elrod* extends to all that fit it substantively; it cannot be legislated away. Indeed, the Personnel Law objectives, embracing all "confidential" employees, seem addressed to the true meaning of the word—employees who must be trusted to respect all confidences to which they might be exposed. See, for example, in section 1350's compilation, subsection "(3) Assistant heads of agencies and their personal secretaries and drivers." However important it is that employees keep confidences, general trustworthiness is not to be measured by political affiliation. To continue the war analogy, our side versus the ene-

my, would be quite incompatible with First Amendment freedoms. *Branti*'s reformulation of the *Elrod* standard, whether political affiliation is "an appropriate requirement for ... effective performance of the public office involved," *Branti*, ante, 445 U.S. at 518, 100 S.Ct. at 1295, recognized that labels like "confidential" or "policymaking" do not alone render political affiliation an appropriate prerequisite for a particular job.

We realize, as we believe did the district court, that a court should go slow before granting, by an interlocutory order, the affirmative relief ultimately requested. And it is, of course, understandable, not only that political officeholders wish to be surrounded by kindred thinkers, but also, to return to our original observation, that there must be some prospective rewards for political activities, or the life-blood will dry up. It is difficult not to share in the views expressed by Justice Powell, dissenting in *Elrod*, which we have crudely reflected, ante, in speaking of politics as the life-blood of the body politic.[1] However, it is also impossible to dismiss the plurality opinion views, not only as to personal rights, but as to the "inefficiency" of "wholesale" turnovers, 427 U.S. at 364 & 367, 96 S.Ct. at 2685 & 2686; *see, also, Colon v. CRUV*, 84 J.T.S. 52 (P.R.1984), every time there is a shift in the majority of the voters. It is worth noting that in *Colon v. CRUV* the Supreme Court of Puerto Rico made the same adverse finding with regard to these very offices as did the district court. While defendants' disappointment is understandable, and their arguments as to the political importance of plaintiffs' positions not without merit, we cannot say that the district court was clearly wrong in its tentative conclusions, or misapplied the standard.

We will add two comments. Defendants say, suppose our party platform had includ-

---

1. It would be presumptuous to attempt to summarize Justice Powell's dissent (concurred in by the Chief Justice, and Justice Rehnquist), 427 U.S., ante, at 376–389, 96 S.Ct. at 2691–2697, but we quote the following. "Patronage practices broadened the base of political participation by providing incentive to take part in the process thereby increasing the volume of political discourse in society. Patronage also strengthened parties, and hence encouraged the development of institutional responsibility to the electorate on a permanent basis." (379, 96 S.Ct. at 2692).

ed a promise to reorganize this department and make drastic changes; how could we have done it? The short answer is that that is not this case. When the voters can be said to have asked for identified changes, they may well be addressable. There must be limits, however, even to this. Changes of personnel simply on party lines may be what the majority voters asked for, but that desideratum is impermissible.

Second, possibly the majority of voters might want a general change in party affiliation because of confirmed habits of the current office-holders to show improper preferences, with the aid of their powers, to their own party members. Cynically, we might ask whether this reason, although properly prompted, may not contain the equal thought that now it will be our turn; in other words, not rectification, but the spoils system all over again. Defendants must use less draconian methods to cure improprieties. And, of course, as the district court properly noted, there is nothing in the present doctrine forbidding a proper removal.[2] Meanwhile, it could be thought that the very fact that plaintiffs were under scrutiny by political opposites would have a salutary effect. True, they are high level employees, but defendants have two above them. This is a problem to which there is no perfect solution. We cannot quarrel with the district court's provisional resolution. *Cf. Tomczak v. City of Chicago,* 765 F.2d 633, 639 (7th Cir.1985).

■ The final matter calling for our comment is defendants' so-called *Mt. Healthy* defense.[3] In *Mt. Healthy,* the Court recognized a defendant's right to show that, improper motive notwithstanding, it would have discharged the employee in any event. Indeed, if the employment relationship is such that no cause is needed for discharge, the employment can be terminated "for no reason whatever," so long as it is not an illicit reason. *Mt. Healthy,*

429 U.S. 274, at 283, 97 S.Ct. 568, at 574 (First Amendment); *cf. NLRB v. Eastern Smelting & Refining Corp.,* 598 F.2d 666, 669 (1st Cir.1979) (unfair labor practice.). There is, of course, a question of proof. *See, e.g., Dance v. Ripley,* 776 F.2d 370 (1st Cir.1985). Defendants' claim here fell in two parts. First, they argue that they already knew enough grounds for dissatisfaction to justify demotion on the merits. The court was fully warranted in its interim view that these claimed grounds were not the true motivation for demotion. The *Mt. Healthy* test is not whether a sufficient reason existed, but whether, in fact, it was the reason truly espoused. Second, defendants claim that there were even stronger reasons, although not come to light at the time of the demotions. The court held that these could not be considered because, obviously, they could not have been relied on. Inasmuch as we are dealing with a continuing injunction, this was error. *See Smallwood v. United Airlines, Inc.,* 728 F.2d 614, 623 (4th Cir.1984); *Gibson v. Mohawk Rubber Co.,* 695 F.2d 1093, 1097 (8th Cir. 1982); *Murnane v. American Airlines, Inc.,* 482 F.Supp. 135, 148 (D.D.C.1979), *aff'd,* 667 F.2d 98 (D.C.Cir.1981), *cert. denied,* 456 U.S. 915, 102 S.Ct. 1770, 72 L.Ed.2d 174 (1982). It is irrelevant that these were age discrimination cases; the principle is the same. We remind the court of *Mt. Healthy's* caveat, that a party is not to be put in a better position as a result of protected conduct than he would otherwise have been in. 429 U.S. at 285, 286, 97 S.Ct. at 575. That is not presently this case, but the court erred in saying it would not consider matters coming to defendants' attention subsequent to the demotion.

■ At this time and on this record, the court's refusal to consider these matters was harmless error. However, it is to be borne in mind that plaintiffs, under the Puerto Rican statute, have no property in-

---

**2.** We take issue, however, with the court's suggestion that plaintiffs may be dismissed for cause only after an administrative hearing. While this course may effectively insulate officials from charges of political discrimination, nothing in any of the cases—nor, for that mat-

ter, the Personnel Law, as we read it—mandates it. *See* post.

**3.** *Mt. Healthy City School District v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

terest in their position, and may be discharged without cause. *Laureano v. Garcia-Caraballo*, 731 F.2d 101 (1st Cir.1984). Accordingly, any time that defendants can show they are demoting for other than an illicit reason, no matter what it may be, that will be the end. This principle is relevant both with respect to the continuance of the injunction and to damages.

We have considered defendants' other complaints, and find none worthy of discussion. That there could be found to be irreparable harm, and due public interest, *see Elrod*, ante, 427 U.S. at 373, 96 S.Ct. at 2689.

Affirmed.

TORRUELLA, Circuit Judge (Concurring).

Although I agree with the result reached by my brethren, and with much of their reasoning, I respectfully disassociate myself from those parts of this opinion which constitute *obiter dicta* and are advisory in nature. *Paschall v. Christee-Stewart, Inc.*, 414 U.S. 100, 94 S.Ct. 313, 38 L.Ed.2d 298 (1973), *reh'g denied*, 414 U.S. 1138, 94 S.Ct. 884, 38 L.Ed.2d 763 (1974); *Stephens, Inc. v. United States*, 464 F.2d 53 (8th Cir.1972), *cert. denied*, 409 U.S. 1118, 93 S.Ct. 911, 34 L.Ed.2d 702 (1973). Particularly when dealing with what the majority, in quoting Churchill, has aptly described as something "quite as dangerous" as war, I am of the opinion that Article III courts should be especially fastidious in not supplying ammunition for future use by any side. It would appear that parties as ably represented as were those in this litigation should be able to navigate the well-charted waters of § 1983 litigation without unnecessary prompting on our part.

Memorandum on Petition for Rehearing

PER CURIAM.

In accordance with a growing, and all too frequent, practice, disappointed appellants seek rehearing with allegations founded

more on the fact that they lost than on the content of our opinion. Basically, we have "conflict[ed] with precedents already established," and have not given adequate "consideration to the District Court's application of an improper legal standard." [1] Stopping here, we held that the district court had applied a proper standard. Nor should it be difficult to see that the cases we failed to cite were pre-*Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), and to note that we referred, in so many words, to *"Branti's reformulation* of the *Elrod* standard."* (Emphasis supplied.)

Next, defendants protest that they "did not rely on the classifications of the Personnel Law." Seemingly they forget that a whole section of their Memorandum of Law has an early sentence setting the tone of the several pages following. "Here, appellants' actions must be understood in the context of the Puerto Rico Public Service Personnel Act of 1975...." Defendants next assert that under both *Branti* and *Elrod* there is no First Amendment protection for positions—employees—having "meaningful input into government policymaking or ... access to confidential information." This is a substantial over-simplification of *Branti*, which qualified those terms by adding a requirement of the appropriateness, viz., an affirmative need, of party affiliation for proper performance of the job. In respect to such need the petition, like the initial brief, is totally silent. We list all given duties of plaintiff Jimenez-Fuentes' position in an appendix, the political nature of which a court might well feel to be superficial (by stipulation of the parties, these duties are identical to the duties performed by plaintiff Vicente Vazquez).

Finally, the petition quite misstates what we said in regard to *Mt. Healthy City School District v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

*The petition is denied.*

---

1. We have also, incidentally, treated this as "another run of the mill preliminary injunction case;" evidenced, apparently, by the fact that we cited only one case to supply the ground rules.

APPENDIX

COMMONWEALTH OF PUERTO RICO

CENTRAL OFFICE FOR PERSONNEL ADMINISTRATION

BOX 8476, FERNANDEZ JUNCOS STATION, SANTURCE, P.R. 00910

JOB DESCRIPTION

1. Department or Agency:  Housing Department

2. Bureau, division and section:  Public Housing Adm.

Caguas Region

• • •

4. First Surname:      JIMENEZ
   Second Surname:   FUENTES
   Name:                ARNALDO

• • •

6. Title of Classification of Position:  Regional Director

• • •

7. Detail the work you perform in the order of importance of the different tasks, starting with the most important. . . . Use your own words and make a description of your duties so clearly that persons not familiriazed [sic] with your job would understand exactly what [it] is that you do. . . .

1. Directs, plans and supervises the operational and administrative activities of the Region, such as: Accounting, Personnel and Occupation, Maintenance, Modernization, Community Labor, Management and Section 8.

2. Reviews and signs the reports submitted to the Central Office, HUD and other related agencies.

3. See to it that the norms and regulations are complied with in accordance to the philosophy of the Public Housing Administration and the HUD Federal Agency.

4. Arranges periodic meetings with supervisory personnel to counsel and inform as to changes in norms and regulations and/or new work guidelin[e]s and other matters.

5. Reviews, approves and signs the reports on rent changes, which are sent to the Federal Agency, Central Office of the Housing Department and other agencies; reports on Accounting, purchase orders, disbursements, functional budgets of the Region and preliminary budget of maintenance works and others.

6. Attends, representing the Agency, to meetings with other government officers or civic leaders from the community in order to discuss and coordinate the implementation of Social Services, economics, health and other type[s] of services offered to public housing residents and programs of the Housing Department.

7. Drafts reports related to the work performed.

8. Drafts correspondence for the signature of the Associate Director and/or CRUV Executive Director.

9. Supervises and evaluates the Supervisors of the different sections attached to the Region.

10. Makes recommendations on personnel recruitment, dismissals, promotions, salary increases and other relations with the Region's employees.

APPENDIX—Continued

11. Recruits necessary irregular personnel at the Region.

12. Receives and hears residents or general public in problematic cases which have not been solved at a lower level.

13. Performs periodic visits to the housing projects at the Region.

14. Attends periodic meetings with the Associate Director, to discuss problems related to the operations of the Region.

15. Offers recommendations to the Executive Director to improve the services rendered by the Program.

16. Arranges meetings with residents and/or organized groups in the community for the coordination of social activities.

17. Plans and organizes training for the Region's employees in coordination with the Training Committee.

18. Receives telephone calls to give or receive information related to the Region's operations.

19. Is responsible for the preparation and control of the functional budget of the Region.

20. Performs any task as assigned.