642 A.2d 349

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. STEVEN D. VAWTER AND DAVID J. KEARNS,
DEFENDANTS–APPELLANTS.

Argued October 12, 1993—Decided May 26, 1994.

58

*Stephen M. Pascarella* argued the cause for appellant David J. Kearns (*Allegra, Pascarella & Nebelkopf,* attorneys).

*John T. Mullaney, Jr.,* argued the cause for appellant Steven D. Vawter.

*Robert A. Honecker, Jr.,* Second Assistant Prosecutor, argued the cause for respondent (*John Kaye,* Monmouth County Prosecutor, attorney).

*Debra L. Stone,* Deputy Attorney General, argued the cause for *amicus curiae,* Attorney General of New Jersey (*Fred DeVesa,* Acting Attorney General, attorney).

The opinion of the Court was delivered by

CLIFFORD, J.

Defendants are charged with violations of *N.J.S.A.* 2C:33–10 (Section 10) and –11 (Section 11), New Jersey's so-called hate-crime statutes. They contend that the statutes are unconstitutional under the First and Fourteenth Amendments to the United States Constitution. The trial court denied defendants' motion to dismiss the indictment, and the Appellate Division granted leave to appeal. We granted defendants' motion for direct certification, 133 *N.J.* 407, 627 *A.2d* 1123 (1993). Following, as we must, the United States Supreme Court's decision in *R.A.V. v. City of St. Paul,* 505 *U.S.* ——, 112 *S.Ct.* 2538, 120 *L.Ed.2d* 305 (1992), we now declare the cited statutes unconstitutional, and therefore reverse the judgment below.

I

On May 13, 1991, a person or persons spray-painted a Nazi swastika and words appearing to read "Hitler Rules" (the spray-painters misspelled "Hitler") on a synagogue, Congregation B'nai Israel, in the Borough of Rumson. On that same night the same person or persons also spray-painted a satanic pentagram on the driveway of a Roman Catholic church, the Church of the Nativity, in the neighboring Borough of Fair Haven.

In March 1992 the Monmouth County Prosecutor's Office received confidential information from witnesses identifying defendants, Stephen Vawter and David Kearns, as the persons who had spray-painted the synagogue and the driveway of the church. In

due course a Monmouth County grand jury returned a twelve-count indictment against Vawter and Kearns. Counts One through Four charged defendants with having put another in fear of violence by placement of a symbol or graffiti on property, a third-degree offense, in violation of Section 10; Counts Five through Eight charged defendants with fourth-degree defacement contrary to Section 11; Counts Nine and Ten charged defendants with third-degree criminal mischief in violation of *N.J.S.A.* 2C:17-3; and Counts Eleven and Twelve charged defendants with conspiracy to commit the offenses charged in Counts One through Ten.

Defendants moved to dismiss Counts One through Eight of the indictment on the ground that Sections 10 and 11 violate their First and Fourteenth Amendment rights under the United States Constitution. Section 10 reads as follows:

A person is guilty of a crime of the third degree if he purposely, knowingly or recklessly puts or attempts to put another in fear of bodily violence by placing on public or private property a symbol, an object, a characterization, an appellation or graffiti that exposes another to threats of violence, contempt or hatred on the basis of race, color, creed or religion, including, but not limited to[,] a burning cross or Nazi swastika. A person shall not be guilty of an attempt unless his actions cause a serious and imminent likelihood of causing fear of unlawful bodily violence.

Section 11 provides:

A person is guilty of a crime of the fourth degree if he purposely defaces or damages, without authorization of the owner or tenant, any private premises or property primarily used for religious, educational, residential, memorial, charitable, or cemetery purposes, or for assembly by persons of a particular race, color, creed or religion by placing thereon a symbol, an object, a characterization, an appellation, or graffiti that exposes another to threat of violence, contempt or hatred on the basis of race, color, creed or religion, including, but not limited to, a burning cross or Nazi swastika.

In denying defendants' motion to dismiss the first eight counts of the indictment the trial court, satisfied that it could distinguish Sections 10 and 11 from the St. Paul ordinance in *R.A.V.*, held Sections 10 and 11 constitutional. On this appeal we address defendants' constitutional challenge to those sections.

## II

Our cases recognize that "[i]n the exercise of police power, a state may enact a statute to promote public health, safety or the general welfare." *State, Dep't of Envtl. Protection v. Ventron Corp.*, 94 *N.J.* 473, 499, 468 *A.*2d 150 (1983). The authority of the State to regulate is limited, however; a State may not exercise its police power in a manner "repugnant to the fundamental constitutional rights guaranteed to all citizens." *Gundaker Cent. Motors v. Gassert*, 23 *N.J.* 71, 79, 127 *A.*2d 566 (1956), *appeal denied*, 354 *U.S.* 933, 77 *S.Ct.* 1397, 1 *L.Ed.*2d 1533 (1957). Here, defendants charge that the statutes under which they were charged offend their fundamental constitutional right to freedom of speech under the First Amendment.

Sections 10 and 11 do not proscribe speech per se. Rather, they prohibit certain kinds of conduct. Section 10 prohibits the conduct of "put[ting] or attempt[ing] to put. another in fear of bodily violence by placing on * * * property a symbol * * * that exposes another to threats of violence, contempt or hatred on the basis of race, color, creed or religion, including, but not limited to[,] a burning cross or Nazi swastika." Section 11 forbids the conduct of "defac[ing] or damag[ing private premises or property] * * * by placing thereon a symbol * * * that exposes another to threats of violence, contempt or hatred on the basis of race, color, creed or religion, including, but not limited to, a burning cross or Nazi swastika."

To decide whether the conduct proscribed by Sections 10 and 11 is "sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments," *Spence v. Washington*, 418 *U.S.* 405, 409, 94 *S.Ct.* 2727, 2730, 41 *L.Ed.*2d 842, 846 (1974), we must determine whether "[a]n intent to convey a particularized message [i]s present" and whether those who view the message have a great likelihood of understanding it. *Id.* at 410–11, 94 *S.Ct.* at 2730, 41 *L.Ed.*2d at 847. The Supreme Court has concluded in a variety of contexts that conduct is sufficiently expressive to fall within the protections of the First

Amendment. See, *e.g., Texas v. Johnson*, 491 *U.S.* 397, 109 *S.Ct.* 2533, 105 *L.Ed.*2d 342 (1989) (holding protected the burning of flag to protest government policies); *Spence, supra*, 418 *U.S.* 405, 94 *S.Ct.* 2727, 41 *L.Ed.*2d 842 (holding protected the placing of peace symbol on flag to protest invasion of Cambodia and killings at Kent State); *Tinker v. Des Moines School District*, 393 *U.S.* 503, 89 *S.Ct.* 733, 21 *L.Ed.*2d 731 (1969) (holding protected the wearing of black armbands to protest war in Vietnam).

In *R.A.V., supra*, 505 *U.S.* ——, 112 *S.Ct.* 2538, 120 *L.Ed.*2d 305, the United States Supreme Court determined that a St. Paul, Minnesota, Bias–Motivated Crime Ordinance proscribed expressive conduct protected by the First Amendment. The ordinance read:

> Whoever places on public or private property a symbol, object, appellation, characterization or graffiti, including, but not limited to, a burning cross or Nazi swastika, which one knows or has reasonable grounds to know arouses anger, alarm or resentment in others on the basis of race, color, creed, religion or gender commits disorderly conduct and shall be guilty of a misdemeanor.
>
> [St. Paul, Minn. *Legis. Code* § 292.02 (1990).]

As one court has noted, "While the [*R.A.V.*] Court did not explicitly state that * * * acts prohibited by the [St. Paul ordinance] are expression cognizable by the First Amendment, such a conclusion necessarily precedes the Court's holding that the [ordinance] facially violate[s] the First Amendment." *State v. Sheldon*, 332 *Md.* 45, 629 *A.*2d 753, 757 (1993).

Taking the lead from the Supreme Court, States with similar hate-crime statutes have determined also that the conduct proscribed by their statutes constitutes protected expression. For example, the Court of Appeals of Maryland found that the conduct prohibited by its statute, "burn[ing] or caus[ing] to be burned any cross or other religious symbol upon any private or public property," *Md.Code Ann., Crim. Law* Art. 27, § 10A, qualifies as speech for purposes of the First Amendment. *Sheldon, supra*, 629 *A.*2d at 757. The Maryland court reasoned that "[b]ecause of the[ ] well known and painfully apparent connotations of burning religious symbols, there can be no doubt that those who engage in

such conduct intend to 'convey a particularized message,' or that those who witness the conduct will receive the message." *Ibid.*

Similarly, in *State v. Talley,* 122 *Wash.*2d 192, 858 *P.*2d 217, 230 (1993), the Supreme Court of Washington concluded that part of its hate-crime statute regulates speech for purposes of the First Amendment. That part of the Washington statute reads: "The following constitute per se violations of th[e malicious harassment statute]: (a) Cross burning; or (b) Defacement of the property of the victim or a third person with symbols or words when the symbols or words historically or traditionally connote hatred or threats toward the victim." *Wash. Rev.Code* § 9A.36.080(2). The Washington court declared that the statute "clearly regulates protected symbolic speech * * *." *Talley, supra,* 858 *P.*2d at 230. See also *State v. Ramsey,* 430 *S.E.*2d 511, 514 (S.C.1993) (finding that statute prohibiting placement of burning or flaming cross on public property or on private property without owner's permission regulates protected symbolic conduct).

◼ Not all statutes dealing with hate crimes, however, necessarily regulate speech for purposes of the First Amendment. Although enactments like the St. Paul ordinance and the Maryland and Washington statutes have been viewed as regulating expression protected by the First Amendment, courts have found that victim-selection or penalty-enhancement statutes target mere conduct and do not restrict expression. Those statutes punish bias in the motivation for a crime by enhancing the penalty for that crime. See, *e.g., Wisconsin v. Mitchell,* 508 *U.S.* ——, ——, 113 *S.Ct.* 2194, 2201, 124 *L.Ed.*2d 436, 447 (1993) (finding that statute increasing penalty for selecting target of crime based on race, religion, color, disability, sexual orientation, national origin, or ancestry of person "is aimed at conduct unprotected by the First Amendment"); *People v. Miccio,* 155 *Misc.*2d 697, 589 *N.Y.S.*2d 762, 764–65 (Crim.Ct.1992) (finding that statute that elevates crime of simple harassment to crime of aggravated harassment when bias motive is present targets only conduct); *State v. Plowman,* 314 *Or.* 157, 838 *P.*2d 558, 564–65 (1992), (finding that

statute that elevates crime of assault from misdemeanor to felony when defendant acts because of perception of victim's race, color, religion, national origin, or sexual orientation is directed against conduct), *cert. denied,* —— *U.S.* ——, 113 *S.Ct.* 2967, 125 *L.Ed.*2d 666 (1993); *Tally, supra,* 858 *P.*2d at 222 (finding that *Wash.Rev. Code* § 9A.36.080(1), which "enhances punishment for [criminal] conduct where the defendant chooses his or her victim because of [the victim's] perceived membership in a protected category," is aimed at conduct). We are satisfied, however, that Sections 10 and 11 are more similar to the former category of statute than to the latter. Sections 10 and 11 do not increase the penalty for an underlying offense because of a motive grounded in bias; rather, those sections make criminal the expressions of hate themselves.

We therefore conclude that Sections 10 and 11 regulate expression protected by the First Amendment. When a person places a Nazi swastika on a synagogue or burns a cross in an African–American family's yard, the message sought to be conveyed is clear: by painting the swastika or by burning the cross, a person intends to express hatred, hostility, and animosity toward Jews or toward African–Americans. "There are certain symbols * * * that in the context of history carry a clear message of racial supremacy, hatred, persecution, and degradation of certain groups." Mari J. Matsuda, *Public Response to Racist Speech: Considering the Victim's Story,* 87 *Mich.L.Rev.* 2320, 2365 (1989). Such messages are not only offensive and contemptible, they are all too easily understood. In fact, the sort of conduct regulated by Sections 10 and 11 is a successful, albeit a reprehensible, vehicle for communication: "Victims of vicious hate propaganda have experienced physiological symptoms and emotional distress ranging from fear in the gut, rapid pulse rate and difficulty in breathing, nightmares, post-traumatic stress disorder, hypertension, psychosis and suicide." *Id.* at 2336. Thus, Sections 10 and 11 meet the requirements of *Spence, supra,* 418 *U.S.* 405, 94 *S.Ct.* 2727, 41 *L.Ed.*2d 842, in that they address conduct that is heavily laden with an unmistakable message. Those sections therefore regulate speech for purposes of the First Amendment.

In concluding that the statutes regulate protected expression, we reject the argument of the Attorney General and of the trial court that because Sections 10 and 11 "require a specific intent to threaten harm against another because of [ ] race," *State v. Davidson*, 225 *N.J.Super.* 1, 14, 541 *A.*2d 700 (App.Div.1988), those statutes regulate only conduct. In *State v. Finance American Corp.*, 182 *N.J.Super.* 33, 38, 440 *A.*2d 28 (1981), the Appellate Division found that because *N.J.S.A.* 2C:33–4, the harassment statute, requires the speaker to have the specific intent to harass the listener, the statute regulates conduct. Sections 10 and 11, however, do more than add a specific intent requirement. As we have noted, the statutes regulate expression itself. Thus, we must analyze Sections 10 and 11 under the appropriate level of First Amendment scrutiny.

## III

The Supreme Court has observed that although governments have a "freer hand" in regulating expressive conduct than in regulating pure speech, they may not "proscribe particular conduct *because* it has expressive elements." *Johnson, supra,* 491 *U.S.* at 406, 109 *S.Ct.* at 2540, 105 *L.Ed.*2d at 354–55. " 'A law *directed* at the communicative nature of conduct must * * * be justified by the substantial showing of need that the First Amendment requires.' " *Id.* at 406, 109 *S.Ct.* at 2540, 105 *L.Ed.*2d at 355 (quoting *Community for Creative Non–Violence v. Watt*, 703 *F.*2d 586, 622–23 (D.C.Cir.1983) (Scalia, J., dissenting)).

■ If " 'the governmental interest [behind Sections 10 and 11] is unrelated to the suppression of free expression,' " *id.* at 407, 109 *S.Ct.* at 2540, 105 *L.Ed.*2d at 355 (quoting *United States v. O'Brien*, 391 *U.S.* 367, 377, 88 *S.Ct.* 1673, 1679, 20 *L.Ed.*2d 672, 680 (1968)), the First Amendment requires that the regulation meet only the lenient *O'Brien* test. Under that test,

a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free

expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

[*O'Brien, supra,* 391 *U.S.* at 377, 88 *S.Ct.* at 1679, 20 *L.Ed.*2d at 680.]

 If Sections 10 and 11 relate to the suppression of free expression, we must decide if the statutes are content neutral or content based to determine the level of scrutiny that we should apply under the First Amendment. "The principal inquiry in determining content-neutrality * * * is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward v. Rock Against Racism,* 491 *U.S.* 781, 791, 109 *S.Ct.* 2746, 2754, 105 *L.Ed.*2d 661, 675 (1989). If a regulation is content neutral, "reasonable time, place, or manner restrictions" are appropriate. *Clark v. Community for Creative Non–Violence,* 468 *U.S.* 288, 293, 104 *S.Ct.* 3065, 3069, 82 *L.Ed.*2d 221, 227 (1984). Time, place, or manner regulations are reasonable if they are "narrowly tailored to serve a significant governmental interest, and [ ] they leave open ample alternative channels for communication * * *." *Ibid.*

 If, however, we decide that Sections 10 and 11 relate to the suppression of free expression and that they are content based, the strictest judicial scrutiny is warranted: "Content-based statutes are presumptively invalid." *R.A.V., supra,* 505 *U.S.* at ——, 112 *S.Ct.* at 2542, 120 *L.Ed.*2d at 317. To survive strict scrutiny, a regulation must be "necessary to serve a compelling state interest and [it must be] narrowly drawn to achieve that end." *Perry Educ. Ass'n v. Perry Local Educ. Ass'n,* 460 *U.S.* 37, 45, 103 *S.Ct.* 948, 955, 74 *L.Ed.*2d 794, 804 (1983).

 We conclude that Sections 10 and 11 are content-based restrictions. In adopting those sections the Legislature was obviously expressing its disagreement with the message conveyed by the conduct that the statutes regulate. The State argues that the statutes are "directed primarily against conduct" and that they only "incidentally sweep up" speech. Although the legislative history is not instructive, other factors persuade us that the State's characterization of Sections 10 and 11 is incorrect.

First, New Jersey had statutes proscribing the same conduct as Sections 10 and 11 before the enactment of those sections in 1981. Section 10 deals with "placing on public or private property a symbol, an object, a characterization, an appellation or graffiti * * *." Section 11 deals with "defac[ing] or damag[ing] * * * private premises or property * * *." Yet, other statutes proscribe exactly the same conduct: first, the criminal-mischief statute, *N.J.S.A.* 2C:17-3, prohibits damaging or tampering with the tangible property of another (the State charged defendants, Vawter and Kearns, under that statute in addition to Sections 10 and 11); second, the criminal-trespass statute, *N.J.S.A.* 2C:18-3, forbids entering or remaining in any structure that one knows one is not licensed or privileged to enter; and finally—if the offense is cross burning and if the conditions of the incident are appropriate—the arson statute, *N.J.S.A.* 2C:17-1, criminalizes starting a fire, thereby putting another person in danger of death or bodily injury or thereby placing a building or structure in danger of damage or destruction. Thus, the Legislature enacted Sections 10 and 11 specifically to condemn the expression of biased messages. Even in the absence of those statutes the State could have continued to punish the conduct of painting racially- or religiously-offensive graffiti or of burning a cross under then-existing laws.

Second, the statements of Governor Byrne, who signed Sections 10 and 11 into law, and the circumstances surrounding the signing support a finding that the Legislature adopted Sections 10 and 11 to denounce racially- or religiously-biased messages. As the Governor declared in his conditional veto, for technical reasons, of an earlier version of the statutes:

> Our democratic society must not allow intimidation of racial, ethnic or religious groups by those who would use violence or would unlawfully vent their hatred. All members of racial, ethnic or religious groups must be able to participate in our society in freedom and with a full sense of security. This is what distinguishes America. And this is what this bill preserves.
>
> [*Governor's Veto Message to Assembly Bill No. 334* (June 15, 1981).]

By that statement, the Governor declared his, and the general, understanding that the Legislature's purpose was to announce its disagreement with the expression of biased messages. Moreover,

on September 10, 1981, Governor Byrne signed the statutes into law at Congregation B'nai Yeshrun in Teaneck, a synagogue that had been defaced with swastikas and obscenities in October 1979. That special signing ceremony (at which the Governor and the sponsors of the legislation, Assemblyman Baer and Senator Feldman, spoke) demonstrates also that the statutes were aimed specifically at denouncing messages of hatred. Thus, we conclude that the Governor and the Legislature, by enacting Sections 10 and 11, intended to regulate expressions of racial and religious hatred.

The intent and purpose behind the statutes could hardly be more laudable. And yet the unmistakable fulfillment of that purpose is what renders Sections 10 and 11 content-based restrictions. As the Supreme Court emphasized in *Ward, supra,* 491 *U.S.* at 791, 109 *S.Ct.* at 2754, 105 *L.Ed.*2d at 675, "The principal inquiry in determining content neutrality * * * is whether the government has adopted a regulation of speech because of disagreement with the message it conveys. The government's purpose [in enacting a statute] is the controlling consideration." That Sections 10 and 11 are content based is not the end of our inquiry, however. Although presumptively invalid, content-based restrictions are nevertheless permissible in some instances.·

## IV

Ordinarily, we would ascertain at this point whether Sections 10 and 11 are narrowly tailored to serve a compelling State interest. Before applying strict scrutiny, however, we depart reluctantly from what we consider traditional First Amendment jurisprudence to analyze our statutes in light of Justice Scalia's five-member majority opinion in *R.A.V., supra,* 505 *U.S.* ——, 112 *S.Ct.* 2538, 120 *L.Ed.*2d 305. Although we are frank to confess that our reasoning in that case would have differed from Justice Scalia's, we recognize our inflexible obligation to review the constitutionality of our own statutes using his premises. *See Battaglia v. Union County Welfare Bd.,* 88 *N.J.* 48, 60, 438 *A.*2d 530 (1981) (noting

that New Jersey Supreme Court is "bound by the [United States] Supreme Court's interpretation and application of the First Amendment and its impact upon the states under the Fourteenth Amendment"), *cert. denied,* 456 *U.S.* 965, 102 *S.Ct.* 2045, 72 *L.Ed.*2d 490 (1982).

In *R.A.V.,* the United States Supreme Court concluded that the Bias–Motivated Crime Ordinance of St. Paul, Minnesota, is unconstitutional because "it prohibits otherwise permitted speech solely on the basis of the subjects the speech addresses." 505 *U.S.* at ——, 112 *S.Ct.* at 2542, 120 *L.Ed.*2d at 316. The defendant in that case and several teenagers had burned a cross inside the fenced yard of an African–American family. Although the State could have punished the defendant's conduct under several statutes, including those prohibiting terroristic threats, arson, and criminal damage to property, *id.* at —— n. 1, 112 *S.Ct.* at 2541 n. 1, 120 *L.Ed.*2d at 315 n. 1, St. Paul chose to charge the defendant under its Bias–Motivated Crime Ordinance, quoted *supra,* at 64, 642 *A.*2d at 353.

The defendant challenged the St. Paul ordinance as "substantially overbroad and impermissibly content-based" under the First Amendment. 505 *U.S.* at ——, 112 *S.Ct.* at 2541, 120 *L.Ed.*2d at 315. The trial court dismissed the charge against the defendant, but the Minnesota Supreme Court reversed, holding that the ordinance reaches only fighting words and thus proscribes only expression that remains unprotected by the First Amendment. *In re Welfare of R.A.V.,* 464 *N.W.*2d 507, 510 (1991). The Minnesota Supreme Court concluded that because the ordinance was narrowly tailored to promote a compelling government interest, it survived constitutional attack. *Id.* at 511.

In invalidating the ordinance, Justice Scalia accepted as authoritative the Minnesota Supreme Court's statement that "the ordinance reaches only those expressions that constitute 'fighting words' within the meaning of *Chaplinsky*[ *v. New Hampshire,* 315 *U.S.* 568, 572, 62 *S.Ct.* 766, 769, 86 *L.Ed.* 1031, 1035 (1942) (defining "fighting words" as "conduct that itself inflicts injury or tends to incite immediate violence") ]." *R.A.V., supra,* 505 *U.S.* at

——, 112 *S.Ct.* at 2542, 120 *L.Ed.*2d at 316. Justice Scalia then reasoned that although "[c]ontent-based regulations are presumptively invalid," *id.* at ——, 112 *S.Ct.* at 2542, 120 *L.Ed.*2d at 317, our society permits restrictions on "the content of speech in a few limited areas * * *." *Id.* at ——, 112 *S.Ct.* at 2542–43, 120 *L.Ed.*2d at 317 (citing *Chaplinsky, supra,* 315 *U.S.* at 572, 62 *S.Ct.* at 769, 86 *L.Ed.* at 1035). Those areas include obscenity, defamation, and fighting words. *Id.* at ——, 112 *S.Ct.* at 2543, 120 *L.Ed.*2d at 317. Justice Scalia pointed out that although the Supreme Court has sometimes said that those proscribable categories are "'not within the area of constitutionally protected speech'", *ibid.* (quoting *Roth v. United States,* 354 *U.S.* 476, 483, 77 *S.Ct.* 1304, 1308, 1 *L.Ed.*2d 1498, 1506 (1957)), that proposition is not literally true. *Id.* at ——, 112 *S.Ct.* at 2543, 120 *L.Ed.*2d at 317–18. In fact, those areas of proscribable speech can "be made vehicles for content discrimination * * *." *Id.* at ——, 112 *S.Ct.* at 2543, 120 *L.Ed.*2d at 318. Thus, the Supreme Court reads the First Amendment to impose a content-discrimination limitation on a State's prohibition of proscribable speech. *Id.* at ——, 112 *S.Ct.* at 2545–46, 120 *L.Ed.*2d at 320.

Justice Scalia, however, noted exceptions to the prohibition against content discrimination in the area of proscribable speech. The first exception to the prohibition exists "[w]hen the basis for the content discrimination consists entirely of the very reason the entire class of speech at issue is proscribable." *Id.* at ——, 112 *S.Ct.* at 2545, 120 *L.Ed.*2d at 320–21. A second exception is found when a "subclass [of proscribable speech] happens to be associated with particular 'secondary effects' of the speech, so that the regulation is '*justified* without reference to the content of the * * * speech.'" *Id.* at ——, 112 *S.Ct.* at 2546, 120 *L.Ed.*2d at 321 (quoting *Renton v. Playtime Theatres, Inc.,* 475 *U.S.* 41, 48, 106 *S.Ct.* 925, 929, 89 *L.Ed.*2d 29, 38 (1986)). The final classification is a catch-all exception for those cases in which "the nature of the content discrimination is such that there is no realistic possibility that official suppression of ideas is afoot." *Id.* at ——, 112 *S.Ct.* at 2547, 120 *L.Ed.*2d at 322.

Applying the foregoing principles, Justice Scalia determined that the St. Paul ordinance is facially unconstitutional, even if read as construed by the Minnesota Supreme Court to reach only "fighting words." *Id.* at ——, 112 *S.Ct.* at 2547, 120 *L.Ed.*2d at 323. The vice of the ordinance, as perceived by the Supreme Court majority, is that it is content discriminatory; in fact, the ordinance "goes even beyond mere content discrimination to actual viewpoint discrimination." *Id.* at ——, 112 *S.Ct.* at 2547, 120 *L.Ed.*2d at 323. "Displays containing abusive invective, no matter how vicious or severe, are permissible unless they are addressed to one of the specified disfavored topics[: race, color, creed, religion, or gender]." *Id.* at ——, 112 *S.Ct.* at 2547, 120 *L.Ed.*2d at 323.

Justice Scalia found that the St. Paul ordinance does not fall within any of the exceptions to the prohibition on content discrimination. The ordinance does not fit within the first exception for content discrimination—the entire class of speech is proscribable—because

> fighting words are categorically excluded from the protection of the First Amendment [because] their content embodies a particularly intolerable (and socially unnecessary) *mode* of expressing *whatever* idea the speaker wishes to convey. St. Paul has not singled out an especially offensive mode of expression * * *. Rather, it has proscribed fighting words of whatever manner that communicate messages of racial, gender, or religious intolerance.
>
> [*Id.* at ——, 112 *S.Ct.* at 2548–49, 120 *L.Ed.*2d at 324.]

Nor does the ordinance fit within the second exception—discrimination aimed only at secondary effects—because neither listeners' reactions to speech nor the emotive impact of speech is a secondary effect. *Id.* at ——, 112 *S.Ct.* at 2549, 120 *L.Ed.*2d at 325 (citing *Boos v. Barry*, 485 *U.S.* 312, 321, 108 *S.Ct.* 1157, 1163–64, 99 *L.Ed.*2d 333, 344–45 (1988)). Finally, Justice Scalia concluded that "[i]t hardly needs discussion that the ordinance does not fall within [the third] more general exception permitting *all* selectivity that for any reason is beyond the suspicion of official suppression of ideas." *Id.* at ——, 112 *S.Ct.* at 2549, 120 *L.Ed.* at 325.

Applying *R.A.V.* to this appeal, we conclude that even if we were to read Sections 10 and 11 to regulate only fighting words, a

class of proscribable speech, those statutes do not fit within any of the exceptions to the prohibition against content discrimination.

■ The Attorney General argues that because Sections 10 and 11 regulate only threats of violence, those sections fall within the first exception for content discrimination—the entire class of speech is proscribable. In discussing threats under the first exception Justice Scalia pointed out that

> the Federal Government can criminalize [ ] those threats of violence that are directed against the President, see 18 U.S.C. § 871, since the reasons why threats of violence are outside the First Amendment (protecting individuals from the fear of violence, from the disruption that fear engenders, and from the possibility that the threatened violence will occur) have special force when applied to the President.

[*Id.* at ——, 112 *S.Ct.* at 2546, 120 *L.Ed.*2d at 321.]

But Justice Scalia observed that "the Federal Government may not criminalize only those threats against the President that mention his policy on aid to inner cities." *Ibid.*

We see two shortcomings in the Attorney General's argument that because our statutes are permissible regulations of threats, they fit within the first exception. First, the statutes do not prohibit only threats. Section 10 prohibits "put[ing] or attempt[ing] to put another in fear of bodily violence by placing on public or private property a symbol * * * that exposes another to *threats of violence, contempt or hatred on the basis of race, color, creed or religion * * *.*" (Emphasis added.) Section 11 precludes "defac[ing] or damag[ing] * * * private premises or property * * * by placing thereon a symbol * * * that exposes another to *threats of violence, contempt or hatred on the basis of race, color, creed or religion * * *.*" (Emphasis added.) Thus, Sections 10 and 11 proscribe not only threats of violence but also expressions of contempt and hatred. Moreover, on close examination the "contempt and hatred" language may pose vagueness and overbreadth issues. We need not address those issues, however, because we could apply a limiting construction to restrict the application of Sections 10 and 11 only to threats of violence.

█ But even if we were somehow to construe Sections 10 and 11 to proscribe only threats of violence, we would encounter another problem: our statutes proscribe threats "on the basis of race, color, creed or religion." Under the Supreme Court's ruling in *R.A.V.*, that limitation renders the statutes viewpoint-discriminatory and thus impermissible. Although a statute may prohibit threats, it may not confine the prohibition to only certain kinds of threats on the basis of their objectionable subject matter. Thus, the first exception cannot save Sections 10 and 11.

█ Nor does the second exception for discrimination aimed only at secondary effects rescue Sections 10 and 11. The only secondary effects the statutes arguably could target are the same secondary effects the St. Paul ordinance targeted in *R.A.V.*, namely, " 'protect[ion] against the victimization of a person or persons who are particularly vulnerable because of their membership in a group that historically has been discriminated against.' " 505 *U.S.* at ——, 112 *S.Ct.* at 2549, 120 *L.Ed.*2d at 325 (quoting Brief for Respondent, City of St. Paul). Thus, Sections 10 and 11 fail for the same reason that the St. Paul ordinance failed: secondary effects do not include listeners' reactions to speech or the emotive impact of speech. *Id.* at ——, 112 *S.Ct.* at 2549, 120 *L.Ed.*2d at 325.

█ Finally, just as in *R.A.V.*, our statutes do not fall within the third, more general exception for discrimination that is unrelated to official suppression of ideas. As we noted, *supra* at 67, 642 *A.*2d at 355, the Legislature enacted Sections 10 and 11 specifically to outlaw messages of racial or religious hatred. Thus, we cannot say that Sections 10 and 11 are unrelated to the official suppression of ideas.

The decisions of other State courts support our conclusion that Sections 10 and 11 do not fall within any of the exceptions to the prohibition on content discrimination. See *Sheldon, supra,* 629 *A.*2d at 761–62, (concluding that Maryland statute precluding "burn[ing] or caus[ing] to be burned any cross or other religious symbol upon any private or public property" did not fall within

any of the *R.A.V.* exceptions); *Talley, supra,* 858 *P.*2d at 231 (finding that Washington statute prohibiting "(a) Cross Burning; or (b) Defacement of the property of the victim or a third person with symbols or words when the symbols or words historically or traditionally connote hatred or threats toward the victim" falls squarely within the prohibitions of *R.A.V.*). *But see In re M.S.,* 22 *Cal.App.*4th 988, 22 *Cal.Rptr.*2d 560, 570–71 (Ct.App.1993) (finding that California statute providing that no person may "by force or threat of force, willfully injure, intimidate or interfere with, oppress, or threaten any other person * * * because of the other person's race, color, ancestry, national origin, or sexual orientation," and that "no person shall be convicted * * * based upon speech alone, [unless] the speech itself threatened violence" falls within all three *R.A.V.* exceptions).

### V

■ Strict scrutiny requires that a regulation be narrowly drawn to achieve a compelling state interest. *Burson v. Freeman,* 504 *U.S.* ——, ——, 112 *S.Ct.* 1846, 1851, 119 *L.Ed.*2d 5, 14 (1992). So exacting is the inquiry under strict scrutiny that the Supreme Court "readily acknowledges that a law rarely survives such scrutiny * * *." *Id.* at ——, 112 *S.Ct.* at 1852, 119 *L.Ed.*2d at 15. "The existence of adequate content-neutral alternatives * * * 'undercut[s] significantly' any defense [that a] statute [is narrowly-tailored]." *R.A.V., supra,* 505 *U.S.* at ——, 112 *S.Ct.* at 2550, 120 *L.Ed.*2d at 326 (quoting *Boos, supra,* 485 *U.S.* at 329, 108 *S.Ct.* at 1168, 99 *L.Ed.*2d at 349).

In *R.A.V., supra,* the Supreme Court rejected the argument that the St. Paul ordinance survives strict scrutiny. 505 *U.S.* at ——, 112 *S.Ct.* at 2549–50, 120 *L.Ed.*2d at 325–26. Justice Scalia did find a compelling interest: "the ordinance helps to ensure the basic human rights of members of groups that have historically been subjected to discrimination * * *." *Id.* at ——, 112 *S.Ct.* at 2549, 120 *L.Ed.*2d at 325. But he concluded that the St. Paul ordinance is not narrowly tailored because "[a]n ordinance not

limited to the favored topics, for example, would have precisely the same beneficial effect." *Id.* at ——, 112 *S.Ct.* at 2550, 120 *L.Ed.*2d at 326. Thus, the St. Paul ordinance is underinclusive and fails the strict-scrutiny analysis. *Accord Sheldon, supra,* 629 *A.*2d at 762–63 (finding that Maryland's statute fails strict scrutiny); *Talley, supra,* 858 *P.*2d at 230–31 (finding Washington statute unconstitutional).

 We conclude that Sections 10 and 11 are underinclusive and thus impermissible under *R.A.V.* Sections 10 and 11 serve the same compelling state interest that the St. Paul ordinance served: protecting the human rights of members of groups that historically have been the object of discrimination. But our hate-crime statutes, like the St. Paul ordinance, are not narrowly tailored. *R.A.V.* dictates that where other content-neutral alternatives exist, a statute directed at disfavored topics is impermissible. Inasmuch as the language of Sections 10 and 11 limits their scope to the disfavored topics of race, color, creed, and religion, the statutes offend the First Amendment.

## VI

The judgment of the trial court is reversed. The cause is remanded to the Law Division for entry there of judgment dismissing counts one through eight of the indictment and for further proceedings as may be appropriate on the remaining counts.

STEIN, J., concurring.

I join the Court's opinion declaring unconstitutional *N.J.S.A.* 2C:33–10 and –11, New Jersey's so-called hate-crime statutes. Variations of New Jersey's statutes have been enacted in most states, reflecting a national consensus that bias-motivated violence or bias-motivated conduct that tends to incite violence has reached epidemic proportions warranting the widespread enactment of laws criminalizing such behavior. I agree especially with the Court's acknowledgment, *ante* at 61, 642 *A.*2d at 352, that we declare New Jersey's hate-crime statutes unconstitutional because

we are compelled to do so by the United States Supreme Court's decision in *R.A.V. v. City of St. Paul*, 505 *U.S.* ——, 112 *S.Ct.* 2538, 120 *L.Ed.*2d 305 (1992), a decision that the Court characterizes as one requiring that "we depart reluctantly from what we consider traditional First Amendment jurisprudence * * *." *Ante* at 70, 642 *A.*2d at 357.

I write separately to explain my disagreement and dismay over the United States Supreme Court's decision in *R.A.V.* My views concerning the merits of the Supreme Court's opinion in *R.A.V.* are, of course, irrelevant to our disposition of this appeal. In cases that turn on interpretations of the United States Constitution, our mandate is simple—to adhere to the decisions of our nation's highest Court, whose authority is final. Criticism by a state court judge addressed to a Supreme Court decision interpreting the federal Constitution might be regarded as intemperate, tending "inevitab[ly] [to shadow] the moral authority of the United States Supreme Court." *State v. Hempele*, 120 *N.J.* 182, 226, 576 *A.*2d 793 (1990) (O'Hern, J., concurring in part and dissenting in part). As Justice O'Hern observed in *Hempele*:

> Throughout our history, we have maintained a resolute trust in that Court as the guardian of our liberties.
>
> The most distinct aspect of our free society under law is that all acts of government are subject to judicial review. Whether we have agreed with the Supreme Court or not, we have cherished most its right to make those judgments. In no other society does the principle of judicial review have the moral authority that it has here.

[<em>Ibid.</em>]

The *R.A.V.* decision, however, is extraordinary. Its principal impact is to invalidate the hate-crime statutes of New Jersey and of numerous other states, statutes that undoubtedly were drafted with a view toward compliance with First Amendment standards. *See, e.g., State v. Sheldon*, 332 *Md.* 45, 629 *A.*2d 753, 763 (1993); *State v. Ramsey*, 430 *S.E.*2d 511, 514–15 (S.C.1993); *State v. Talley*, 122 *Wash.*2d 192, 858 *P.*2d 217, 230 (1993). That effect alone warrants close examination of *R.A.V.*'s rationale, so substantial is the number of state legislatures that had determined that

conduct constituting so-called "hate-crimes" should be criminalized, and that that objective could be achieved consistent with the First Amendment. *See Talley, supra,* 858 *P.*2d at 219 (noting that "[n]early every state has passed what has come to be termed a 'hate crimes statute'"); *see also Hate Crimes Statutes: A 1991 Status Report, ADL Law Report* (Anti–Defamation League of B'nai B'rith, New York, N.Y.), 1991, at 6–10 (describing types of hate-crime statutes enacted by various states) (hereinafter *1991 Status Report*). If only to learn where they went astray, state legislators, as well as their constituents whose complaints inspired enactment of hate-crime laws, have a special interest in understanding *R.A.V.*'s holding.

Another, and more disconcerting, aspect of the Supreme Court's decision in *R.A.V.*, given its national significance, is the severity and intensity of the criticism that the four concurring members addressed to the rationale adopted by the majority opinion. Those members joined the Court's judgment only, not its opinion. Their objections to the Court's opinion convey a sense of astonishment about the Court's unexpected treatment of the First Amendment questions. Justice White observed:

> But in the present case, the majority casts aside long-established First Amendment doctrine without the benefit of briefing and adopts an untried theory. This is hardly a judicious way of proceeding, and the Court's reasoning in reaching its result is transparently wrong.

> \* \* \* \* \* \* \* \*

> Today, the Court has disregarded two established principles of First Amendment law without providing a coherent replacement theory. Its decision is an arid, doctrinaire interpretation, driven by the frequently irresistible impulse of judges to tinker with the First Amendment. The decision is mischievous at best and will surely confuse the lower courts. I join the judgment, but not the folly of the opinion.

> [505 *U.S.* at ——, ——, 112 *S.Ct.* at 2551, 2560, 120 *L.Ed.*2d at 328, 339.]

Justice Blackmun's concurring opinion questioned the majority's true objectives:

I regret what the Court has done in this case. The majority opinion signals one of two possibilities: it will serve as precedent for future cases, or it will not. Either result is disheartening.

\* \* \* \* \* \* \* \*

In the second instance is the possibility that this case will not significantly alter First Amendment jurisprudence, but, instead, will be regarded as an aberration—a case where the Court manipulated doctrine to strike down an ordinance whose premise it opposed, namely, that racial threats and verbal assaults are of greater harm than other fighting words. I fear that the Court has been distracted from its proper mission by the temptation to decide the issue over "politically correct speech" and "cultural diversity," neither of which is presented here. If this is the meaning of today's opinion, it is perhaps even more regrettable.

I see no First Amendment values that are compromised by a law that prohibits hoodlums from driving minorities out of their homes by burning crosses on their lawns, but I see great harm in preventing the people of Saint Paul from specifically punishing the race-based fighting words that so prejudice their community.

[505 *U.S.* at ——, 112 *S.Ct.* at 2560–61, 120 *L.Ed.*2d at 339.]

The concurring opinion of Justice Stevens emphasizes, as did Justice White's, the extent of *R.A.V.*'s departure from generally-accepted First Amendment principles:

Within a particular "proscribable" category of expression, the Court holds, a government must either proscribe *all* speech or no speech at all. This aspect of the Court's ruling fundamentally misunderstands the role and constitutional status of content-based regulations on speech, conflicts with the very nature of First Amendment jurisprudence, and disrupts well-settled principles of First Amendment law.

\* \* \* \* \* \* \* \*

In sum, the central premise of the Court's ruling—that "[c]ontent-based regulations are presumptively invalid"—has simplistic appeal, but lacks support in our First Amendment jurisprudence. To make matters worse, the Court today extends this overstated claim to reach categories of hitherto unprotected speech and, in doing so, wreaks havoc in an area of settled law. Finally, although the Court recognizes exceptions to its new principle, those exceptions undermine its very conclusion that the St. Paul ordinance is unconstitutional. Stated directly, the majority's position cannot withstand scrutiny.

[505 *U.S.* at ——, ——, 112 *S.Ct.* at 2562–63, 2566, 120 *L.Ed.*2d at 341–42, 345–46 (footnote omitted).]

My focus is on the central holding and, in my view, the basic flaw in the *R.A.V.* opinion: that the St. Paul Bias–Motivated Crime Ordinance impermissibly regulates speech based on its content, 505 *U.S.* at ——, 112 *S.Ct.* at 2547, 120 *L.Ed.*2d at 323,

and on its viewpoint, *ibid.*, and cannot be sustained on the ground that the ordinance is narrowly tailored to serve compelling state interests. *Id.* at ——, 112 *S.Ct.* at 2549–50, 120 *L.Ed.*2d at 325–26.

## I

Using language substantially similar to that contained in New Jersey's hate-crime statutes, *N.J.S.A.* 2C:33–10 and –11, the St. Paul, Minnesota, Bias–Motivated Crime Ordinance, invalidated by the Court in *R.A.V.*, provided:

> "Whoever places on public or private property a symbol, object, appellation, characterization or graffiti, including, but not limited to, a burning cross or Nazi swastika, which one knows or has reasonable grounds to know arouses anger, alarm or resentment in others on the basis of race, color, creed, religion or gender commits disorderly conduct and shall be guilty of a misdemeanor."
>
> [*Id.* at ——, 112 *S.Ct.* at 2541, 120 *L.Ed.*2d at 315 (quoting St. Paul, Minn. *Legis.Code* § 292.02 (1990)).]

The defendant in *R.A.V.* was prosecuted under the St. Paul Bias–Motivated Crime Ordinance because he, along with some teenagers, had burned a cross during the night inside the fenced yard of a house occupied by an African–American family. The trial court dismissed the charge before trial, concluding that the ordinance prohibited expressive conduct in violation of the First Amendment. The Minnesota Supreme Court reversed, construing the ordinance as prohibiting only " 'fighting words'—conduct that itself inflicts injury or tends to incite immediate violence." *In re Welfare of R.A.V.*, 464 *N.W.*2d 507, 510 (1991) (citing *Chaplinsky v. New Hampshire*, 315 *U.S.* 568, 572, 62 *S.Ct.* 766, 769, 86 *L.Ed.* 1031, 1035 (1942)). Concluding that the ordinance prohibited only conduct unprotected by the First Amendment and was "narrowly tailored * * * [to accomplish] the compelling governmental interest in protecting the community against bias-motivated threats to public safety and order," the Minnesota Supreme Court sustained the validity of the St. Paul ordinance. *Id.* at 511.

The *R.A.V.* Supreme Court majority opinion declined to address the contention that the St. Paul ordinance was invalidly overbroad. 505 *U.S.* at ——, 112 *S.Ct.* at 2542, 120 *L.Ed.*2d at 316. The

concurring Justices, however, agreed with Justice White's conclusion that although the Minnesota Supreme Court had construed the ordinance to prohibit only fighting words, the Minnesota Court nevertheless had emphasized that the ordinance prohibits " 'only those displays that one knows or should know will create anger, alarm or resentment based on racial, ethnic, gender or religious bias.' " *Id.* at ——, 112 *S.Ct.* at 2559, 120 *L.Ed.*2d at 338 (White, J., concurring in the judgment) (quoting *In re Welfare of R.A.V.,* *supra,* 464 *N.W.*2d at 510); *see id.* at ——, 112 *S.Ct.* at 2561, 120 *L.Ed.*2d at 339 (Blackmun, J., concurring in the judgment); *id.* at ——, 112 *S.Ct.* at 2561, 120 *L.Ed.*2d at 340 (Stevens, J., concurring in the judgment). Justice White, understanding the Minnesota Supreme Court to have ruled "that St. Paul may constitutionally prohibit expression that 'by its very utterance' causes 'anger, alarm or resentment,' " 505 *U.S.* at ——, 112 *S.Ct.* at 2559, 120 *L.Ed.*2d at 338, concluded that the ordinance was invalid because of overbreadth:

> Our fighting words cases have made clear, however, that such generalized reactions are not sufficient to strip expression of its constitutional protection. The mere fact that expressive activity causes hurt feelings, offense, or resentment does not render the expression unprotected.
>
> In the First Amendment context, "[c]riminal statutes must be scrutinized with particular care; those that make unlawful a substantial amount of constitutionally protected conduct may be held facially invalid even if they also have legitimate application." *Houston v. Hill,* 482 *U.S.* 451, 459, 107 *S.Ct.* 2502, 2508, 96 *L.Ed.*2d 398 (1987) (citation omitted). The St. Paul antibias ordinance is such a law. Although the ordinance reaches conduct that is unprotected, it also makes criminal expressive conduct that causes only hurt feelings, offense, or resentment, and is protected by the First Amendment. The ordinance is therefore fatally overbroad and invalid on its face.
>
> [*Id.* at ——, 112 *S.Ct.* at 2559–60; 120 *L.Ed.*2d at 338–39 (citations omitted) (footnote omitted).]

Ignoring the overbreadth issue, the Supreme Court majority opinion accepted as authoritative the Minnesota Supreme Court's determination that the St. Paul ordinance reached only conduct that amounts to fighting words, in accordance with *Chaplinsky,* *supra,* 315 *U.S.* at 572, 62 *S.Ct.* at 769, 86 *L.Ed.* at 1035 (defining "fighting words" as "conduct that itself inflicts injury or tends to incite immediate violence"). *R.A.V., supra,* 505 *U.S.* at ——, 112

*S.Ct.* at 2541, 120 *L.Ed.*2d at 316. The Court acknowledged that fighting words, along with defamation and obscenity, are among the categories of speech with respect to which restrictions on content are permitted because they are " 'of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.' " *Id.* at ———, 112 *S.Ct.* at 2543, 120 *L.Ed.*2d at 317 (quoting *Chaplinsky, supra,* 315 *U.S.* at 572, 62 *S.Ct.* at 769, 86 *L.Ed.* at 1035). Although the Supreme Court has said that those proscribable categories of expression are " 'not within the area of constitutionally protected speech,' " *ibid.* (quoting *Roth v. United States,* 354 *U.S.* 476, 483, 77 *S.Ct.* 1304, 1308, 1 *L.Ed.*2d 1498, 1506 (1957)), the *R.A.V.* majority opinion observed that that characterization is not literally true, noting that those categories of speech "can * * * be regulated *because of their constitutionally proscribable content,*" but cannot be made "the vehicles for content discrimination unrelated to their distinctively proscribable content." *Id.* at ———, 112 *S.Ct.* at 2543, 120 *L.Ed.*2d at 318. Accordingly, the Court noted: "The government may not regulate use [of fighting words] based on hostility—or favoritism—towards the underlying message expressed." *Id.* at ———, 112 *S.Ct.* at 2545, 120 *L.Ed.*2d at 320.

Having established its basic premise that even fighting words, a category of generally-proscribable speech, can be a vehicle for content discrimination, the *R.A.V.* opinion concludes that the St. Paul ordinance is facially unconstitutional because it impermissibly discriminates based on the subject of bias-motivated speech. *Id.* at ———, 112 *S.Ct.* at 2547–48, 120 *L.Ed.*2d at 323–24. The Court notes that the St. Paul ordinance applies only to fighting words that provoke violence "on the basis of race, color, creed, religion or gender"; but that those who wish to use fighting words—"to express hostility, for example, on the basis of political affiliation, union membership, or homosexuality—are not covered." *Id.* at ———, 112 *S.Ct.* at 2547, 120 *L.Ed.*2d at 323. The Court determined that that distinction in the content of the speech regulated by the St. Paul ordinance was unconstitutional: "The First

Amendment does not permit St. Paul to impose special prohibitions on those speakers who express views on disfavored subjects." *Ibid.* In effect, the Court concluded that St. Paul could regulate all fighting words or none, but could not single out for regulation only those fighting words that provoke violence based on race, color, creed, religion, or gender.

The Court then determined that the St. Paul ordinance also constituted viewpoint discrimination:

"Fighting words" that do not themselves invoke race, color, religion, or gender—aspersions upon a person's mother, for example—would seemingly be usable [at pleasure] in the placards of those arguing *in favor* of racial, color, etc. tolerance and equality, but could not be used by the speaker's opponents. * * * St. Paul has no such authority to license one side of a debate to fight freestyle, while requiring the other to follow Marquis of Queensbury Rules.

[*Ibid.*]

In that respect the majority opinion viewed the St. Paul ordinance as one taking sides in a dispute between racists and their targets. "By prohibiting fighting words based on race, while allowing other fighting words, the law barred only the fighting words that the racists (and not the fighting words that their targets) would wish to use." Elena Kagan, *The Changing Faces of First Amendment Neutrality: R.A.V. v. St. Paul, Rust v. Sullivan, and the Problem of Content–Based Underinclusion,* 1992 *Sup.Ct.Rev.* 29, 70.

In prohibiting fighting words that provoke violence only on the basis of race, color, creed, religion, or gender, the St. Paul ordinance obviously regulates "speech" based on its content: speech that provokes violence because it is addressed to the five prohibited subjects is barred; speech that provokes violence because it is addressed to other subjects—political affiliation, union membership, or homosexuality, for example—is not barred. Aside from overbreadth problems, Justices White and Stevens, although for different reasons, would have upheld the ordinance even though they acknowledged that it regulated speech based on its content. In the view of Justice White, the majority's concession that the St. Paul ordinance regulates only fighting words to which "the First Amendment does not apply * * * because their expres-

sive content is worthless or of de minimis value to society," 505 *U.S.* at ——, 112 *S.Ct.* at 2552, 120 *L.Ed.*2d at 328, (White, J., concurring), establishes that a content-based regulation of fighting words is insulated from First Amendment review:

> It is inconsistent to hold that the government may proscribe an entire category of speech because the content of that speech is evil, [*New York v. Ferber*, 458 *U.S.* 747, 763–64, 102 *S.Ct.* 3348, 3358–59, 73 *L.Ed.*2d 1113, 1126–27 (1982)]; but that the government may not treat a subset of that category differently without violating the First Amendment; the content of the subset is by definition worthless and undeserving of constitutional protection.
>
> [<em>Id.</em> at ——, 112 <em>S.Ct.</em> at 2553, 120 <em>L.Ed.</em>2d at 330.]

In addition, Justice White urged that even if the ordinance constituted a content-based regulation of protected expression, it would survive strict-scrutiny review as a regulation serving a compelling state interest narrowly drawn to achieve that purpose. Rejecting the majority's observation that the St. Paul ordinance could not survive strict scrutiny because "[a]n ordinance not limited to the favored topics would have precisely the same beneficial effect," *id.* at ——, 112 *S.Ct.* at 2541, 120 *L.Ed.*2d at 325, Justice White relied on *Burson v. Freeman*, 504 *U.S.* ——, 112 *S.Ct.* 1846, 119 *L.Ed.*2d 5 (1992), in which a plurality of the Court sustained a Tennessee statute prohibiting the solicitation of votes and the distribution of campaign literature within one-hundred feet of the entrance to a polling place. Noting that the statute in *Burson* restricted *only political* speech, Justice White observed that the *Burson* plurality had

> squarely rejected the proposition that the legislation failed First Amendment review because it could have been drafted in broader, content-neutral terms: "States adopt laws to address the problems that confront them. *The First Amendment does not require States to regulate for problems that do not exist.*" [505 *U.S.* at ——, 112 *S.Ct.* at 2555, 120 *L.Ed.*2d at 332 (quoting *Burson, supra,* 504 *U.S.* at ——, 112 *S.Ct.* at 1856, 119 *L.Ed.*2d at 20) (emphasis added).]

Justice Stevens was unwilling to rely on the majority's concession that the St. Paul ordinance regulates only fighting words, observing that "[t]he categorical approach sweeps too broadly when it declares that all such expression is beyond the protection of the First Amendment." *Id.* at ——, 112 *S.Ct.* at 2566–67, 120 *L.Ed.*2d at 347 (Stevens, J., concurring). In that respect Justice

Stevens's view is consistent with that of commentators who have urged abandonment of or diminished reliance on the fighting-words doctrine. See, *e.g.,* Laurence H. Tribe, *American Constitutional Law,* § 12–18, at 929 n. 9 (2d ed. 1988); Stephen W. Gard, *Fighting Words as Free Speech,* 58 *Wash.U.L.Q.* 531 (1980); Kenneth L. Karst, *Equality as a Central Principle in the First Amendment,* 43 *U.Chi.L.Rev.* 20, 30–35 (1975); Nadine Strossen, *Regulating Racist Speech on Campus: A Modest Proposal?,* 1990 *Duke L.J.* 484, 508–14. Rejecting the categorical approach as one that "sacrifices subtlety for clarity," 505 *U.S.* at ——, 112 *S.Ct.* at 2566, 120 *L.Ed.*2d at 346, Justice Stevens similarly rejected as "absolutism" the majority's view that content-based regulations, even of fighting words, are presumptively invalid. *Id.* at ——, 112 *S.Ct.* at 2564, 120 *L.Ed.*2d at 343. Observing that selective regulation of speech based on content was unavoidable, Justice Stevens noted that the Court frequently had upheld content-based regulations of speech. *Ibid.* (citing *FCC v. Pacifica Found.,* 438 *U.S.* 726, 98 *S.Ct.* 3026, 57 *L.Ed.*2d 1073 (1978) (upholding restriction on broadcast of *specific* indecent words); *Young v. American Mini Theatres, Inc.,* 427 *U.S.* 50, 96 *S.Ct.* 2440, 49 *L.Ed.*2d 310 (1976) (upholding zoning ordinances that regulated movie theaters based on content of films shown); *Lehman v. City of Shaker Heights,* 418 *U.S.* 298, 94 *S.Ct.* 2714, 41 *L.Ed.*2d 770 (1974) (upholding ordinance prohibiting political advertising but permitting commercial advertising on city buses); *Broadrick v. Oklahoma,* 413 *U.S.* 601, 93 *S.Ct.* 2908, 37 *L.Ed.*2d 830 (1973) (upholding state statute restricting speech of state employees concerning partisan political matters)).

As an alternative to Justice White's categorical approach and the majority's formulation that content-based regulation is presumptively invalid, Justice Stevens observed that the Court's First Amendment jurisprudence reveals "a more complex and subtle analysis, one that considers the content and context of the regulated speech, and the nature and scope of the restriction on speech." 505 *U.S.* at ——, 112 *S.Ct.* at 2567, 120 *L.Ed.*2d at 347. Justice Stevens explained that "the scope of protection provided expres-

sive activity depends in part upon its content and character," *id.* at ——, 112 *S.Ct.* at 2567, 120 *L.Ed.*2d at 348, noting that the First Amendment accords greater protection to political speech than to commercial speech or to sexually explicit speech, *id.* at ——, 112 *S.Ct.* at 2567-68, 120 *L.Ed.*2d at 348, and that " 'government generally has a freer hand in restricting expressive conduct than it has in restricting the written or spoken word.' " *Id.* at ——, 112 *S.Ct.* at 2568, 120 *L.Ed.*2d at 348 (quoting *Texas v. Johnson,* 491 *U.S.* 397, 406, 109 *S.Ct.* 2533, 2540, 105 *L.Ed.*2d 342, 354-55 (1989)). Moreover, he noted that the context of the regulated speech affects the scope of protection afforded it. Thus, "the presence of a ' "captive audience," ' " *ibid.* (quoting *Lehman, supra,* 418 *U.S.* at 302, 94 *S.Ct.* at 2717, 41 *L.Ed.*2d at 776 (quoting *Public Util. Comm'n v. Pollack,* 343 *U.S.* 451, 468, 72 *S.Ct.* 813, 823, 96 *L.Ed.* 1068, 1080 (1952) (Douglas, J., dissenting))), or "the distinctive character of a secondary-school environment," *ibid.,* affects the Court's First Amendment analysis. Similarly, Justice Stevens observed that the nature of a restriction on speech "informs our evaluation of its constitutionality," *id.* at ——, 112 *S.Ct.* at 2568, 120 *L.Ed.*2d at 348-49, noting that restrictions based on viewpoint are regarded as more pernicious than those based only on subject matter. *Id.* at ——, 112 *S.Ct.* at 2568, 120 *L.Ed.*2d at 349. Finally, Justice Stevens noted that the scope of content-based restrictions affect their validity. *Id.* at ——, 112 *S.Ct.* at 2569, 120 *L.Ed.*2d at 349.

That analytical framework illuminates the critical distinction between Justice Stevens' evaluation of the St. Paul ordinance and that of the majority. The Court's approach is presumptive and categorical. The majority concluded that the St. Paul ordinance distinguishes—as it surely does—between fighting words addressed to the restricted subjects and all other fighting words. Viewing that distinction as one based impermissibly on content, the Court rejected the contention that the ordinance is narrowly tailored to serve compelling state interests because "[a]n ordinance not limited to the favored topics * * * would have precisely

the same beneficial effect." *Id.* at ——, 112 *S.Ct.* at 2549, 120 *L.Ed.*2d at 326.

In sharp contrast, Justice Stevens first assessed the content and character of the regulated activity, noting that the ordinance applies only to "low-value speech, namely, fighting words," and that it regulates only " 'expressive conduct [rather] than * * * the written or spoken word.' " *Id.* at ——, 112 *S.Ct.* at 2569, 120 *L.Ed.*2d at 350 (quoting *Johnson, supra,* 491 *U.S.* at 406, 109 *S.Ct.* at 2540, 105 *L.Ed.*2d at 355) (alterations in original). Concerning context, he noted that the ordinance restricts speech only "in confrontational and potentially violent situations," *ibid.,* such as that illustrated by the case at hand: "The cross-burning in this case—directed as it was to a single African–American family trapped in their home—was nothing more than a crude form of physical intimidation. That this crossburning sends a message of racial hostility does not automatically endow it with complete constitutional protection." *Ibid.* Finally, Justice Stevens concluded that St. Paul's restriction on speech is based neither on subject matter nor viewpoint, "but rather on the basis of the *harm* the speech causes. * * * [T]he ordinance regulates only a subcategory of expression that causes *injuries based on* 'race, color, creed, religion or gender,' not a subcategory that involves *discussions* that concern those characteristics." *Id.* at ——, 112 *S.Ct.* at 2570, 120 *L.Ed.*2d at 350–51.

## II

Regulation of speech based on content, subject matter, or viewpoint has attracted an outpouring of scholarly commentary. See, *e.g.,* Daniel A. Farber, *Content Regulation and the First Amendment: A Revisionist View,* 68 *Geo.L.J.* 727 (1980); Karst, *supra,* 43 *U.Chi.L.Rev.* 20; Martin H. Redish, *The Content Distinction in First Amendment Analysis,* 34 *Stan.L.Rev.* 113 (1981); Frederick Schauer, *Categories and the First Amendment: A Play in Three Acts,* 34 *Vand.L.Rev.* 265 (1981); Paul B. Stephan III, *The First Amendment and Content Discrimination,* 68 *Va.L.Rev.*

203 (1982); Geoffrey R. Stone, *Content Regulation and the First Amendment*, 25 *Wm. & Mary L.Rev.* 189 (1983); Geoffrey R. Stone, *Restrictions of Speech Because of its Content: The Peculiar Case of Subject–Matter Restrictions*, 46 *U.Chi.L.Rev.* 81 (1978); Cass R. Sunstein, *Words, Conduct, Caste*, 60 *U.Chi.L.Rev.* 795 (1993). Although variations in the formulation of content-based regulation of speech may present difficult and controversial First Amendment questions, courts need not abandon pragmatism and common sense in favor of "arid, doctrinaire interpretation." *R.A.V., supra*, 505 *U.S.* at ——, 112 *S.Ct.* at 2560, 120 *L.Ed.*2d at 339 (White, J., concurring). Even those commentators who advocate a categorical approach to First Amendment adjudication acknowledge the need to allow for enough play in the joints to avoid anomalous results:

> What we mean when we express animosity towards content regulation is that we should not create subcategories within the first amendment that are inconsistent with the theoretical premises of the concept of freedom of speech. Moreover, we do not wish to create subcategories that, either because of the inherent indeterminacy of the category or because of the difficulty in verbally describing that subcategory, create an undue risk of oversuppression. While these are powerful reasons, they are not so conclusive that they should prevail in every case. When strong reasons for creating a subcategory present themselves, and when the dangers can be minimized or eliminated, the mechanized uttering of "content regulation" need not prevent the embodiment in first amendment doctrine of the plain fact that there are different varieties of speech.
>
> [Schauer, *supra*, 34 *Vand.L.Rev.* at 290 (footnote omitted).]

Although the Supreme Court divided five to four on the constitutionality of the St. Paul ordinance (apart from the issue of overbreadth), I find incontestable the superiority of the balancing test advocated by Justice Stevens compared with the categorical and presumptive approach adopted by the *R.A.V.* majority. To hold the St. Paul ordinance presumptively invalid because it fails to criminalize fighting words addressed to topics other than race, color, creed, religion, or gender ignores not only established First Amendment jurisprudence but also common experience as well.

The *R.A.V.* majority takes pains to classify the primary vice of the St. Paul ordinance not as "underinclusiveness" but as "content discrimination": "In our view, the First Amendment imposes not

an 'underinclusiveness' limitation but a 'content discrimination' limitation upon a State's prohibition of proscribable speech." *R.A.V., supra,* 505 *U.S.* at ——, 112 *S.Ct.* at 2545, 120 *L.Ed.*2d at 320. But when the *R.A.V.* majority explains what it means by content discrimination, its explanation underscores that the "discrimination" in content that renders St. Paul's ordinance facially invalid derives solely from St. Paul's failure to have expanded the breadth of the ordinance to criminalize fighting words addressed to other subjects—in other words, the ordinance is "underinclusive":

> Although the phrase in the ordinance, "arouses anger, alarm or resentment in others," has been limited by the Minnesota Supreme Court's construction to reach only those symbols or displays that amount to "fighting words," the remaining, unmodified terms make clear that the ordinance applies only to "fighting words" that insult, or provoke violence, "on the basis of race, color, creed, religion or gender." Displays containing abusive invective, no matter how vicious or severe, are permissible unless they are addressed to one of the specified disfavored topics. Those who wish to use "fighting words" in connection with other ideas—to express hostility, for example, on the basis of political affiliation, union membership, or homosexuality—are not covered. The First Amendment does not permit St. Paul to impose special prohibitions on those speakers who express views on disfavored subjects.
>
> [*Id.* at ——, 112 *S.Ct.* at 2547, 120 *L.Ed.*2d at 323.]

But the *R.A.V.* Court's conclusion that "[t]he First Amendment does not permit St. Paul to impose special prohibitions on those speakers who express views on disfavored subjects" begs the very question that the Court has resolved differently in a number of cases involving underinclusive regulations of speech: whether a law targeting some but not all speech in a category is invalid as a content-based discrimination or is sustainable by deferring to the legislative judgment concerning which of several causes of a problem government elects to regulate. *See* William E. Lee, *The First Amendment Doctrine of Underbreadth,* 71 *Wash.U.L.Q.* 637, 638 (1993); Stone, *supra,* 25 *Wm. & Mary L.Rev.* at 202–07. Characteristically, the Court has invalidated underinclusive regulations under circumstances in which the governmental justification for singling out the burdened class or favoring the excluded class is considered insufficient. See, *e.g., City of Cincinnati v.*

*Discovery Network, Inc.,* 507 *U.S.* ——, 113 *S.Ct.* 1505, 123 *L.Ed.*2d 99 (1993) (invalidating Cincinnati ordinance intended to promote aesthetics by prohibiting use of newsracks on public property to dispense commercial publications but permitting use of newsracks to dispense newspapers); *Florida Star v. B.J.F.,* 491 *U.S.* 524, 540, 109 *S.Ct.* 2603, 2612, 105 *L.Ed.*2d 443, 459 (1989) (holding unconstitutional under First Amendment imposition of civil damages against newspaper that violated Florida statute by publishing identity of rape victim, noting that victim's identity had been lawfully obtained and statute was underinclusive in not prohibiting dissemination of victim's identity by means other than publication in any " 'instrument of mass communication' " (quoting Fla.Stat. § 794.03 (1987)); *Arkansas Writers' Project, Inc. v. Ragland,* 481 *U.S.* 221, 234, 107 *S.Ct.* 1722, 1730, 95 *L.Ed.*2d 209, 223 (1987) (invalidating under First Amendment Arkansas sales tax that taxed general-interest magazines but exempted newspapers and religious, professional, trade, and sports journals, noting that Arkansas "advanced no compelling justification for selective content-based taxation of certain magazines"); *First Nat'l Bank v. Bellotti,* 435 *U.S.* 765, 98 *S.Ct.* 1407, 55 *L.Ed.*2d 707 (1978) (invalidating under First Amendment Massachusetts criminal statute prohibiting only banks and business corporations from making expenditures to influence vote on referendum proposals, and finding no compelling state interest sufficient to justify restrictions on corporate speech); *Erznoznik v. City of Jacksonville,* 422 *U.S.* 205, 215, 95 *S.Ct.* 2268, 2275, 45 *L.Ed.*2d 125, 134 (1975) (invalidating on First Amendment grounds ordinance prohibiting drive-in movie theaters with screens visible from public streets from showing films containing nudity; observing that underinclusive classifications may be sustained on theory that government may "deal with one part of * * * problem without addressing all of it," but finding Jacksonville ordinance strikingly underinclusive and lacking any compelling governmental interest sufficient to sustain it); *Police Dept. v. Mosley,* 408 *U.S.* 92, 101–02, 92 *S.Ct.* 2286, 2293–94, 33 *L.Ed.*2d 212, 220 (1972) (invalidating on equal-protection grounds Chicago ordinance prohibiting all picketing, except

peaceful labor picketing, within 150 feet of school buildings on ground that ordinance impermissibly relies on content-based distinction in defining allowable picketing; observing that governmental interest advanced by City was insufficient to justify content-based discrimination among pickets).

In other settings, however, the Court has not been reluctant to evaluate the governmental interest asserted in justification of allegedly-underinclusive restrictions on speech, and has determined that adequate reasons existed to justify piecemeal regulation. The most recent illustration of that approach is *Burson, supra,* 504 *U.S.* ——, 112 *S.Ct.* 1846, 119 *L.Ed.*2d 5, in which the Court upheld against a First Amendment challenge the validity of a Tennessee statute prohibiting the solicitation of votes and the display or distribution of campaign literature within one-hundred feet of the entrance to a polling place. The Court pointedly rejected the contention that the Tennessee statute was underinclusive for failing to regulate other forms of speech such as charitable and commercial solicitation and exit polling within that radius:

> [T]here is * * * ample evidence that political candidates have used campaign workers to commit voter intimidation or electoral fraud. In contrast, there is simply no evidence that political candidates have used other forms of solicitation or exit polling to commit such electoral abuses. States adopt laws to address the problems that confront them. The First Amendment does not require States to regulate for problems that do not exist.
>
> [*Id.* at ——, 112 *S.Ct.* at 1856, 119 *L.Ed.*2d at 19–20.]

Other cases sustaining allegedly underinclusive regulation of speech include *Austin v. Michigan Chamber of Commerce,* 494 *U.S.* 652, 666, 110 *S.Ct.* 1391, 1401, 108 *L.Ed.*2d 652, 668 (1990) (upholding against First Amendment challenge Michigan statute prohibiting corporations from using corporate funds for independent expenditures on behalf of or in opposition to candidates for state office, and finding regulation supported by compelling state interest in limiting political influence of accumulated corporate wealth; concerning underinclusiveness challenge, Court determined that Michigan's decision "to exclude unincorporated labor unions from [statute] is therefore justified by the crucial differences between unions and corporations"); *United States v. Kokin-*

*da,* 497 *U.S.* 720, 724, 733, 110 *S.Ct.* 3115, 3118, 3128, 111 *L.Ed.*2d 571, 579–80, 586 (1990) (upholding against First Amendment challenge postal regulation barring "[s]oliciting alms and contributions, campaigning for election * * *, commercial soliciting and vending, and displaying or distributing commercial advertising" on Postal Service property; rejecting contention that regulation is underinclusive, Court characterized as "anomalous that the Service's allowance of some avenues of speech would be relied upon as evidence that it is impermissively suppressing other speech"); *City Council v. Taxpayers for Vincent,* 466 *U.S.* 789, 811, 104 *S.Ct.* 2118, 2132, 80 *L.Ed.*2d 772, 791 (1984) (upholding against First Amendment challenge by candidate for city council municipal ordinance prohibiting posting of signs on public property; concerning underinclusiveness challenge, Court finds that aesthetic interest in eliminating signs on public property not compromised by allowing signs on private property, and observing that citizen's interest in controlling use of own property justifies disparate treatment); *Renton v. Playtime Theatres,* 475 *U.S.* 41, 52–53, 106 *S.Ct.* 925, 931, 89 *L.Ed.*2d 29, 41 (1986) (upholding against First Amendment challenge zoning ordinance prohibiting adult motion-picture theatres from locating within 1,000 feet of residential zone, church, park, or school; rejecting underinclusiveness argument, Court stated: "That Renton chose first to address the potential problems created by one particular kind of adult business in no way suggests that the city has 'singled out' adult theaters for discriminatory treatment."); *cf. FEC v. Massachusetts Citizens for Life,* 479 *U.S.* 238, 258 n. 11, 107 *S.Ct.* 616, 628 n. 11, 93 *L.Ed.*2d 539, 557 n. 11 (1986) (holding section 316 of Federal Election Campaign Act, 2 *U.S.C.A.* § 441b, which prohibits corporations from expending treasury funds in connection with elections to public office, unconstitutional as applied to nonprofit corporation formed to promote "pro-life" causes; rejecting underinclusiveness challenge and observing, "That Congress does not at present seek to regulate every possible type of firm fitting this description does not undermine its justification for regulating corporations.").

On at least one occasion the Court rejected an underinclusiveness challenge leveled at a statute criminalizing child pornography, a category of speech that the Court classified, as it had fighting words, as outside the realm of constitutionally-protected expression. *Ferber, supra,* 458 *U.S.* at 754, 763–64, 102 *S.Ct.* at 3353, 3358, 73 *L.Ed.*2d at 1120–21, 1126–27. The statute prohibited the promotion of sexual performances using children under the age of sixteen, and proof that the performances were obscene was not necessary to establish a violation. The New York Court of Appeals had determined that the statute was unconstitutionally underinclusive, in *People v. Ferber,* 52 *N.Y.*2d 674, 439 *N.Y.S.*2d 863, 422 *N.E.*2d 523 (1981), "because it discriminated against visual portrayals of children engaged in sexual activity by not also prohibiting the distribution of films of other dangerous activity." *Ferber, supra,* 458 *U.S.* at 752, 102 *S.Ct.* at 3352, 73 *L.Ed.*2d at 1120. Reversing, the Supreme Court characterized the statute as describing "a category of material the production and distribution of which is not entitled to First Amendment protection. It is therefore clear that there is nothing unconstitutionally 'underinclusive' about a statute that singles out this category of material for proscription." *Id.* at 765, 102 *S.Ct.* at 3359, 73 *L.Ed.*2d at 1128. The Court distinguished its holding from *Erznoznik, supra,* 422 *U.S.* 205, 95 *S.Ct.* 2268, 45 *L.Ed.*2d 125, in which the Jacksonville ordinance

impermissibly singled out movies with nudity for special treatment while failing to regulate other protected speech which created the same alleged risk to traffic. Today, we hold that child pornography as defined in § 263.15 is *unprotected speech subject to content-based regulation.* Hence, it cannot be underinclusive or unconstitutional for a State *to do precisely that.*

[*Ferber, supra,* 458 *U.S.* at 765 n. 18, 102 *S.Ct.* at 3359 n. 18, 73 *L.Ed.*2d at 1128 n. 18 (emphasis added).]

Justice Stevens's pointed observation that the *R.A.V.* majority opinion "wreaks havoc in an area of settled law," 505 *U.S.* at ——, 112 *S.Ct.* at 2566, 120 *L.Ed.*2d at 345, is better understood in the context of the Court's demonstrated flexibility in resolving claims of underinclusive regulation of expression. In rejecting an underinclusiveness challenge to a restriction of political speech—a cate-

gory of speech acknowledged to be entitled to the most comprehensive First Amendment protection, *see* William J. Brennan, Jr., *The Supreme Court and the Meiklejohn Interpretation of the First Amendment,* 79 *Harv.L.Rev.* 1, 11–12 (1965)—the Court in *Burson, supra,* readily deferred to the Tennessee legislature's determination that the regulated speech was the only form of expression requiring governmental restriction. 504 *U.S.* at ——, 112 *S.Ct.* at 1855–56, 119 *L.Ed.*2d at 19–20. And in *Ferber, supra,* in which child pornography was categorized, analogously to fighting words, as beyond the realm of constitutionally-protected expression, 458 *U.S.* at 763–64, 102 *S.Ct.* at 3358, 73 *L.Ed.*2d at 1126–27, the Court deemed it unnecessary to require *any* governmental justification for the statute's underinclusiveness. *Id.* at 765, 102 *S.Ct.* at 3359, 73 *L.Ed.*2d at 1128.

Had the *R.A.V.* majority accorded minimal deference to First Amendment precedent, it would have sustained the St. Paul ordinance (subject to overbreadth problems) by recognizing the obvious governmental interest in criminalizing that subset of fighting words addressed to the designated subjects (race, color, creed, religion, or gender) because bias-motivated threats that tend to incite violence are predominantly addressed to one or more of those subjects. See Mari J. Matsuda, *Public Response to Racist Speech: Considering the Victim's Story,* 87 *Mich.L.Rev.* 2320 (1989) (detailing escalation of bias-related crime and urging criminalization of narrow class of racist speech); *Hate Crime Statutes: A Response to Anti–Semitism, Vandalism and Violent Bigotry, ADL Law Report* (Anti–Defamation League of B'nai B'rith, New York, N.Y.), Spring/Summer 1988 (summarizing statistical data describing most frequent victims and commonly reported forms of hate crimes and compiling relevant state and federal legislation). By including race, color, and religion among the proscribed topics of bias-motivated speech, St. Paul's governmental determination closely resembled that reached by Congress in enacting the Federal Hate Crime Statistics Act, Pub.L. No. 101–275 (codified at 28 *U.S.C.A.* § 534 (note) (1990)), mandating that the Attorney General acquire data over a five-year period

about "crimes that manifest evidence of prejudice based on race, religion, sexual orientation, or ethnicity * * *." *Ibid.* That St. Paul elected not to prohibit. bias-motivated speech addressed to other topics reflects not a preference for one type of speech over another, but simply a decision by public officials to "address the problems that confront them." *Burson, supra,* 504 *U.S.* at ——, 112 *S.Ct.* at 1856, 119 *L.Ed.*2d at 20.

Closely related to .the *R.A.V.* majority's reliance on content discrimination as a ground for invalidating the St. Paul ordinance is its insistence that the ordinance suffers from the additional flaw of discrimination on the basis of viewpoint. *R.A.V., supra,* 505 *U.S.* at ——, 112 *S.Ct.* at 2547–48, 120 *L.Ed.*2d at 323. The *R.A.V.* majority theorizes that the St. Paul ordinance can be construed as choosing sides in a debate between racists and their targets, barring the use of fighting words by racists but allowing the targets of racists to retaliate by using fighting words. *See Kagan, supra,* 1992 *Sup.Ct.Rev.* at 70. That highly theoretical characterization of the St. Paul ordinance should be understood simply as another version of underinclusiveness: if the ordinance banned all fighting words, rather than only those addressed to the designated subjects, neither racists nor their targets would be disadvantaged. Two commentators who analyzed the claim of viewpoint discrimination disagreed on whether the St. Paul ordinance could be so classified. *Compare* Kagan, *supra,* 1992 *Sup.Ct.Rev.* at 70–74 (acknowledging that St. Paul ordinance, as applied but not facially, could effect form of viewpoint discrimination but asserting that such ordinances are sustainable if both necessary and narrowly tailored to serve compelling interest) *with* Sunstein, *supra,* 60 *U.Chi.L.Rev.* at 829 (stating, "Viewpoint discrimination is not established by the fact that in some hypotheticals, one side has greater means of expression than another * * * if the restriction on means has legitimate, neutral justifications."). Both Professors Kagan and Sunstein agree, however, that the validity of the St. Paul ordinance—whether or not it may theoretically constitute viewpoint discrimination—should be resolved by determining whether the special harm caused by the restricted speech justifies

the governmental decision to single out that speech for special sanction. Kagan, *supra*, 1992 *Sup.Ct.Rev.* at 76; Sunstein, *supra*, 60 *U.Chi.L.Rev.* at 825.

The historical significance of the bias-related harm threatened by the speech restricted by St. Paul's ordinance underscores the fundamental imbalance in the majority's First Amendment analysis. By emphasizing those fighting words that St. Paul has determined it need not regulate, and underestimating the danger posed by the regulated expression, the majority "fundamentally miscomprehends the role of 'race, color, creed, religion [and] gender' in contemporary American society." *R.A.V.*, *supra*, 505 *U.S.* at —— n. 9, 112 *S.Ct.* at 2570 n. 9, 120 *L.Ed.*2d at 351 n. 9 (Stevens, J., concurring) (alterations in original). The *R.A.V.* majority also overlooks the historical context that explains governmental determinations to single out as especially pernicious bias-motivated speech that incites violence based on race and color. One can recall an earlier time in which discrimination based on race and color was authorized by law:

> Racial discrimination could be found in all parts of the United States. But it was different in the South, and far more virulent, because it had the force of law. State law condemned blacks to a submerged status from cradle to grave, literally. The law segregated hospitals and cemeteries. It confined black children to separate and grossly inferior public schools. Policemen enforced rules that made blacks ride in the back of the bus and excluded them from most hotels and restaurants. And blacks had little or no voice in making the law, for in much of the South they were denied the right to vote.
>
> Officially enforced segregation was not some minor phenomenon found only in remote corners of the South. In the middle of the twentieth century black Americans could not eat in a restaurant or enter a movie theater in downtown Washington, D.C. Public schools were segregated in seventeen Southern and border states and in the District of Columbia: areas with 40 percent of the country's public school enrollment. Through two world wars black men were conscripted to serve in segregated units of the armed forces: a form of federally sanctioned racism that was only ended by President Harry Truman in 1948.
>
> [Anthony Lewis, *Make No Law: The Sullivan Case and the First Amendment* 15–16 (1991).]

Similarly, religious-based bias and discrimination was commonplace during the first half of this century, and incidents of crime

based on religious bigotry have increased significantly in recent years. *See 1991 Status Report, supra,* at 1.

As society strives to overcome the effects of institutionalized bigotry, the occurrence and resurgence of bias-motivated crime understandably provokes a governmental response. That response is informed not by an impulse to regulate expression discriminatorily based on content or viewpoint, but by a pragmatic desire to respond directly to the most virulent and dangerous formulation of bias-motivated incitements to violence. "While a cross-burning as part of a public rally in a stadium may fairly be described as protected speech, burning the same cross on the front lawn of [a] * * * neighbor has an entirely different character." John P. Stevens, *The Freedom of Speech,* 102 *Yale L.J.* 1293, 1310–11 (1993). An interpretation of the First Amendment that prevents government from singling out for regulation those inciteful strains of hate speech that threaten imminent harm will be incomprehensible to public officials and to the citizens whose interests such laws were enacted to protect.

That the Supreme Court's holding in *R.A.V.* binds us in our disposition of this appeal is indisputable. Whether it persuades us is another question entirely.

STEIN, J., concurs in the result.

*For reversal and remandment*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, GARIBALDI and STEIN–6.

*Opposed*—None.